WILLIE BERRY v. STATE.

153 So. 507.
Opinion Filed February 27, 1934.
Petition for Rehearing Denied March 28, 1934.

R. B. *Moseley,* for Plaintiff in Error;

Cary D. *Landis,* Attorney General, and *Roy Campbell,* Assistant, for the State.

PER CURIAM.—The first count of the indictment herein charges:

"That Willie Berry, on the 11th day of March, A. D. 1933, in the county and State aforesaid, unlawfully and feloniously and while perpetrating an act imminently dangerous to another, and evincing a depraved mind regardless of human life, although without any premeditated design to affect the death of any particular individual, did inflict upon Jess Owens a mortal wound by striking and beating him with a piece of brick, a more particular description of said weapon being to the Grand Jurors unknown, of which mortal wound the said Jess Owens did languish and die on the 24th day of March, A. D. 1933."

Trial was had on a plea of not guilty, and the following verdict was rendered:

"We the jury find the defendant guilty of murder in the second degree on the first count, so say we all."

"BOB SMITH, *Foreman.*"

A motion for new trial was overruled, an exception thereto being noted, and the court imposed the following sentence, to-wit:

"You, Willie Berry, having been convicted by a jury of the offense of murder in the second degree, the Court adjudges you to be guilty, it is therefore the judgment of the Court and the sentence of the law that you, Willie Berry, for your said offense be confined in the State Prison of the State of Florida, at hard labor, for and during the period of your natural life."

Section 1, Chapter 8470, Acts of 1921, Section 7137, Compiled General Laws, defines murder in the second degree and the penalty therefor as follows:

"The unlawful killing of a human being * * * when perpetrated by an act imminently dangerous to another, and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual, * * * shall be murder in the second degree, and shall be punished by imprisonment in the State Prison for life, or for any number of years not less than twenty years."

Several visitors, among them Willie Berry, were at the home of Jesse Owens when he was fatally wounded at night a short distance from the door of his dwelling house. Henry Bryant, a witness for the State, testified that when he arrived, Jesse Owens was sitting in the house by the fire. Willie Berry was in the room, and that:

"I had been there about five minutes, I guess, and Willie Berry called Jesse Owens out, and he got up and walked out and got to the gate—called him again—and they was arguing and cursing and he struck Owens along side the head with his fist and knocked him down. He got up and backed off and he was following him, and he backed off I guess

fifteen or twenty feet and telling him not to come on to him no more. He picked up a brick or something, I took it to be a brick." Mr. Walker: "Are you testifying he picked up a brick?" A.—"Yes, sir; I saw the brick, and hit him just above the left ear and knocked him down and unconscious. Then he calls for the camphor bottle." Q.—"Who calls for the camphor?" A.—"Willie Berry, says, 'Bring me the camphor; I believe I have killed him.'" Q.—"What was done?" A.—"We bathed his face and he came to and we toted him in the house and put him to bed." * * * Q.—"Did Jesse Owens fall to the ground at the time he was hit the, first time?" A.—"Yes, sir, fell to his knees." Q.—"What did he then do?" A.—"When he raised he got up backing off." Q.—"Was he backing straight or staggering?" A.—"Staggering back." Q.—"Did the defendant here follow him right on?" A.—"Yes sir." Q.—"Where did the defendant pick up this brick from?" A.—"About half way between those two gates." Q.—"Did you see him when he picked it up?" A.—"Yes sir." * * * Q.—"Did you see any knife in the hand of Jesse Owens?" A.—"No sir." Q.—"Did he have any weapon in his hand at all?" A.—"No sir, not as I saw." Q.—"Did you see any weapon in his hand when he went out of the room?" A.—"No sir." * * * Q.—"Were you there when his hands were taken out of his pockets?" A.—"Yes sir." Q.—"Did you search his pockets?" A.—"No sir." Q.—"Did anyone search them in your presence?" A.—"Julian Lanier got his knife out of his pocket." Q.—"Which pocket did he pull the knife out of?" A.—"Out of his right pocket." Q.—"Was it open or closed?" A.—"It was closed." Q.—"Did you later have occasion to look for that brick?" A.—"No sir, not until later; it was over a week before the brick was looked for." Q.—"Did you later have it?" A.—"Caleb Owens

come down there and asked me—" Q.—"Don't state what he said. Did you go with Caleb Owens to look for it?" A.—"Yes sir." Q.—"Where did you look for it?" A.— "Right across the road in the briars where he threw it." Q.—"Did you find the brick?" A.—"Yes sir; we found a little better than a quarter of a brick." Q.—"Were there any other pieces there in the briars?" A.—"No sir." Q.— "Did you take that brick out of the place where you saw the defendant throw it that night?" A.—"Yes sir." * * * Q.—"When you got out on the porch how long were you there before the first lick?" A.—"Just as I walked out and got to the edge of the porch." Q.—"Which direction was Jesse Owens facing at the time he was hit the first time?" A.—"He was facing the north." Q.—"Did you see any weapon in his hand at the time that lick landed on him?" A.—"No sir." Q.—"Was he making any move or apparent attempt to go on to the defendant, or was the defendant coming on to him?" A.—"The defendant was coming on to him; he wasn't making no attempt on him at all." Q.—"Did he ever make any attempt that you saw to go on to the defendant?" A.—"No sir." * * * Q.—"About what time did the fight take place?" A.—"Between ten and eleven o'clock." Q.—"Who worked on the wound?" A.—"I kept the blood wiped off his face as long as I was down there, and then Willie got some old spider web out of the top and put on there to stop the blood."

There was corroborating testimony for the State. In the defendant's testimony he stated:

"I walked out to the door and gate and started off home, started up the road for home and I had got I suppose five steps when he came out of the gate and called, and I stopped and turned round and walked back toward him, and he come on up there where I was and says, 'If you will furnish

the money I will get the liquor and we will pitch a party tomorrow night,' and I said, 'Jesse, I haven't got any money.' It seemed like it made him mad and he run his hand in his pocket to get his knife and said, 'You are a God damn lying son of a bitch," and got his knife and run at me and I shoved him back; I didn't want to hurt him, I thought he was drunk, and says, 'Put up your knife,' and when I shoved him it made him mad again, and I hit him that time hard enough to knock him down and he fell, and I hit him again on the side of the head and I stood there and looked at him and turned him over and it looked like he was knocked out, and I run my hand under his arm and says, 'Go get some camphor, he must be knocked out,' and I picked him up and told Julian Lanier to take the knife out of his pocket and Julian took the knife out his hand and shut it up and put it into his pocket. We carried him in the house and I got some water and bathed his face and washed off the blood and looked at the wound on the side of his head and I couldn't figure out how it got there, but I went in and he was bleeding right on and I got some spider web and put there to stop the blood. Some of the boys went out with a flash light and looked at the ditch where he fell to see what he fell on and I didn't hear them say whether they found anything or not. I stayed around there for a while to see if he was going to get along all right and then I went home." Q.—"Didn't you hit him with that piece of brick?" A.—"No sir." Q.—"Or a piece just like that?" A.—"No sir." Q.—"And after you hit him didn't you throw it in the briars across the road?" A.—"No sir." Q.—"You didn't do that?" A.—"No sir." Q.—"So this wound he got on the side of his head, he got that when he fell in the ditch?" A.—"I can't figure out anything else." Q.—"You just hit him one time?" A.—

"I shoved him the first time and hit him the next with my fist." Q.—"Did you say get the camphor you believed you had killed him?" A.—"I told them to get the camphor I believed he was killed. Q.—"Didn't you say you believed you had killed him?" A.—"No sir." Q.—"Why did you think he was killed if you had just hit him with the fist and he was lying in the ditch, why did you think he was killed?" A.—"I didn't think he was killed." Q.—"You said get the camphor, did he look like he was killed?" A.— "He looked like he was unconscious." Q.—"Was he unconscious?" A.—"I couldn't tell; when I turned him over he groaned but didn't say anything." Q.—"How long did he lie there before the Lanier boy came out and took the knife out of his hand?" A.—"About a minute." Q.—"He was lying there unconscious with the knife clasped in his hand?" A.—"I was picking him up when the boy took the knife out." Q.—"He still had hold of the knife?" A.— "Yes sir." Q.—"Unconscious?" A.—"I won't say he was unconscious then; he wasn't saying anything."

There was corroboration of some of the defendant's testimony.

Julian Lanier, recalled for the State, was asked: Q.— "Did you take a knife out of the hand of Jesse Owens?" A.—"No sir, I taken it out of his pocket." Q.—"Did you take a knife out of his hand and fold it up and put it in his pocket and later take it out of his pocket?" A.—"No sir."

W. B. Singletary for the State was asked: Q.—"Mr. Singletary, did you see this difficulty between Jesse Owens and Willie Berry?" A.—"Yes sir." Q.—"Where were you standing?" A.—"I was standing outside." Q.—"Did you see the licks that were passed?" A.—"Yes sir." Q.— "How many licks were passed?" A.—"He hit him twice." Q.—"Did you see what he hit him with the first time?"

A.—"Yes sir." Q.—"What?" A.—"His fist." Q.—"What did Berry then do, what happened?" A.—"Jesse Owens fell to his knees and got up and staggered backward and told Bill not to come into him, and Bill hit him up side the head with a brick." Q.—"What did Jesse then do?" A.— "He fell." Q.—"Did you see the defendant pick up the brick?" A.—"Yes sir." Q.—"Did Jesse fall in the ditch?" A.—"Not quite in the ditch, not far from the edge."

On cross:

Q.—"You say he picked up the brick?" A.—"Yes sir." Q.—"Would you know the brick if you were to see it?" A.—"Yes sir." Q.—"Is that the brick?" A.—"That looks like it." Q.—"That's just half a brick, or a quarter; don't you know a whole brick from a half?" A.—"That's a brick." Q.—"You wouldn't say whether a half or a whole brick, is that right?" A.—"That's a half brick there."

There is ample testimony that the final blow was struck by the use of a part of brick.

Conflicts in the testimony and the credibility of the witnesses were settled by the verdict which has substantial support in the evidence.

The testimony as to the circumstances under which the accused fatally wounded the deceased as alleged in the indictment affords a sufficient legal basis for a finding that the mortal wound inflicted upon the victim's head by the accused, was the perpetration of an unlawful act imminently dangerous to the person struck, and evincing in the accused a depraved mind regardless of human life, even though the act may have been perpetrated without any premeditated design to effect the death of the person so wounded or any particular individual, which unlawful act when death results therefrom constitutes murder in the second degree under the statute.

The mortal wound was above the left ear and the physicians testified that from the symptoms the immediate cause of the death was tetanus which resulted from germs entering the wound or broken surface on the decedent's head where the mortal wound was inflicted as shown by the testimony. Such testimony is legally sufficient for the purpose designed.

Charges to the jury given by the court covered the crimes of murder in the second degree and manslaughter but not murder in the third degree. This was not error, since in this case the evidence does not tend to establish the commission of murder in the third degree as defined by the statute. Sec. 7137, C. G. L.

The statute provides that one convicted of murder in the second degree "shall be punished by imprisonment in the State prison for life or for a number of years not less than twenty years," and a life sentence is within the power of the trial court to impose. A sentence to be *confined* in the State prison is equivalent to a sentence of *imprisonment* in the State prison.

The verdict finds the defendant guilty of murder in the second degree on the first count and is signed by the foreman of the jury. This, taken in connection with the record in the cause being tried, is sufficient.

Affirmed.

DAVIS, C. J., and WHITFIELD, ELLIS, TERRELL and BUFORD, J. J., concur.