402 So.2d 493 (1981)
Dorothy Melene WRIGHT, Appellant,
v.
The STATE of Florida, Appellee.
No. 79-1150.
District Court of Appeal of Florida, Third District.
August 11, 1981.
*494 Bennett H. Brummer, Public Defender and Ellis S. Rubin, Sp. Asst. Public Defender, for appellant.
Jim Smith, Atty. Gen. and Steven L. Bolotin, Asst. Atty. Gen., for appellee.
Before SCHWARTZ and DANIEL S. PEARSON, JJ., and VANN, HAROLD R. (Ret.), Associate Judge.
DANIEL S. PEARSON, Judge.
Dorothy Wright was charged with the premeditated first degree murder of Barbara Hall. A jury found her guilty of second degree murder. She appeals from the court's judgment and a life term of imprisonment imposed thereon.
Wright contends, inter alia, that (1) she was entitled to the entry of a judgment of acquittal because (a) her uncontradicted grand jury testimony, relied upon by the State to prove her complicity, establishes that she did not shoot at Hall with the intent to kill her, and (b) Wright's shot did not cause Hall's death; (2) she is entitled to a new trial because the trial court denied her requested instruction on her defense of duress; and (3) she is, at least, entitled to have her conviction reduced to manslaughter, since the undisputed proof shows that she acted under duress and not with the depraved state of mind required for second degree murder.
The proof at trial essentially consisted of (a) the medical examiner's testimony that of the three bullets which entered Hall's body, only the shots to the head and neck were lethal, and the shot to the chest (purportedly the one shot fired by Wright) may not have been lethal; and (b) the defendant's grand jury testimony. The defendant did not testify at trial.

I.

Wright's Grand Jury Testimony
Wright testified before the grand jury[1] that she; her separately tried co-defendant, Joe La Rocca[2]; and Barbie Hall worked at the Busy Bee Car Wash in South Miami. On the morning of the murder, approximately January 26, 1979, La Rocca drove Barbie Hall and Wright to work, dropped Barbie off at the car wash, and took Wright to breakfast. At breakfast, La Rocca told Wright that he had to get rid of Barbie because she knew too much. La Rocca and Barbie Hall were living together at the time, and Wright at first thought he meant to throw Hall out of the house. This misconception was short lived. La Rocca said to Wright, "I'm going to have to kill her." La Rocca then told Wright that she would have to do the killing, so that he could be *495 sure Wright would not say anything, and he threatened to kill Wright if she refused. He also told her that he would get Barbie to go with them after work by telling Barbie that they were going to make a cocaine deal.
Wright understood that when La Rocca said that Barbie Hall knew too much, he was referring to a "contract" he had to kill a woman named Linda Norman. Prior to the day of this breakfast, La Rocca had told Wright that he was being paid to kill Linda Norman. In fact, Wright, again before the day of the breakfast and the murder of Hall, had accompanied La Rocca when he firebombed a restaurant where Linda Norman worked. Indeed, after the Hall murder, on an occasion when La Rocca "shot up" an apartment in which Linda Norman was supposed to be staying, Wright drove La Rocca to the scene. Wright said she drove the car because La Rocca told her she had to.
After breakfast, Wright went to work at the car wash. There she saw Barbie Hall. She did not warn Hall that her life was in danger or that she and La Rocca planned to kill her that evening. Wright knew that the killing was planned for that evening. During the afternoon, La Rocca was around "off and on," but Wright was out of his presence for "a couple of hours." Wright admitted that she did not warn Barbie Hall, attempt to flee, call the police, or do anything to avoid or prevent what she knew was about to occur.
La Rocca picked up Wright and then Barbie around 5:00 or 5:30 p.m. Wright knew that Barbie was under the impression that a cocaine deal was planned. La Rocca, Wright and Hall drove down to a field where, according to Wright, Hall "was going to be killed." La Rocca had told Wright when he picked her up that he had checked the place out and found it satisfactory. La Rocca stopped the car, and he and Wright got out. Hall was still in the car changing her shirt. La Rocca handed Wright the gun and asked her if she was ready. Wright said, "No, but I guess I have to be"; La Rocca replied, "You're right," and Wright said, "Okay." Hall got out of the car. All three walked for a distance. While Hall was looking in her purse for something, Wright raised the gun and shot her. The shot hit Hall, and she fell to the ground. Wright was not sure how many times she fired, but she remembered once.
La Rocca grabbed the gun, telling Wright he was going to shoot the victim in the face so she would not be recognized. He straddled Hall and fired two or three times. He then told Wright to help him pull the body into the bushes. Wright said, "I can't." La Rocca dragged the body into the bushes while Wright stood close by pretending to help.
After the murder, La Rocca and Wright went to Elaine's Lounge, where Wright's mother worked. Wright played a game of pool while La Rocca talked to her mother. La Rocca took Wright to her home.
For at least two weeks after the killing, Wright neither called the police nor sought help for the victim. While Wright thought Hall was probably dead, she was not certain. She testified that she was afraid to tell anyone, because La Rocca said he would kill her or her mother.
During this same period after the murder, Wright told people that Hall had decided to leave and go back to Virginia. Wright explained that she said this because "Joe [La Rocca] told me I had to." Wright also began wearing Hall's clothes and gave away certain of Hall's clothing to others. At first she explained this by: "Joe told me that I was to take the clothes and get rid of them." Later she explained that at first La Rocca had told her to wear the clothes and say that Hall had left them for her, but then she began giving the clothing away when she could not take it any more. During the two weeks after the murder, at La Rocca's insistence, Wright went with him to Key Largo for the weekend.
According to Wright, approximately two weeks after the murder, she decided to go to the police and tell her story. Coincidentally, the police had come to her house earlier that day and left a message that they wanted to talk to her. Wright did not *496 speak to any law enforcement officer until after she knew the police were aware of her involvement. She claimed, however, that she had made her decision to go to the police before she knew they were looking for her.[3] This, in essence, was Wright's testimony before the grand jury.

II.

The Judgment of Acquittal
Distinct from the issue of duress, discussed infra, are Wright's contentions that (a) the evidence is uncontradicted that she shot Hall without any intent to kill, but only with an intent to wound[4]; and (b) there was insufficient proof to show that Wright's act proximately caused Hall's death. She says these contentions entitle her to an acquittal of second degree murder. We disagree.
If Wright's act caused the death of Hall, then her contention that she intended only to harm, not kill, is unavailing. Hines v. State, 227 So.2d 334 (Fla. 1st DCA 1969). See also United States Fidelity & Guaranty Company v. Perez, 384 So.2d 904 (Fla.3d DCA 1980) ("recklessly firing a gun into a crowd of people constitutes second degree murder when a person is killed thereby even though ... the defendant had no intent to hit or kill anyone"); Berry v. State, 114 Fla. 73, 153 So. 507 (1934); Gavin v. State, 42 Fla. 553, 29 So. 405 (1900); Golding v. State, 26 Fla. 530, 8 So. 311 (1890). Compare Manuel v. State, 344 So.2d 1317 (Fla.2d DCA 1977) (where defendant fires gun in direction where it would not likely result in harm to anyone, but it does, evidence will support culpable negligence only). But assuming, arguendo, that (a) the State's proof through the testimony of the medical examiner fell short of showing that the bullet which hit Hall's chest caused her death, and (b) the undisputed evidence was that the only shot which Wright fired hit Hall in the chest, and that, therefore, Wright's act did not cause Hall's death, then Wright would be correct that her act of shooting Hall, standing by itself, could not sustain her murder conviction. J.A.C. v. State, 374 So.2d 606 (Fla.3d DCA 1979). Accord, Karl v. State, 144 So.2d 869 (Fla.3d DCA 1962). Wright's argument overlooks that because she acted in concert with another person, she is responsible, not merely for her own acts, but for his. The evidence, including her own grand jury testimony, indisputably supports her conviction as an *497 aider and abettor in La Rocca's killing of Hall.[5]
In order for Wright to be convicted of aiding and abetting La Rocca's crime, the State was required to prove, and did prove, that the crime was committed, that Wright aided in its commission, and that Wright had the intent to participate in the crime. See Beasley v. State, 360 So.2d 1275 (Fla. 4th DCA 1978). The only issue in dispute was Wright's intent to participate, which she says was not shown because of her "unrebutted" duress defense, discussed infra. But that defense aside, Wright's own words, combined with the proof that the crime was committed, are more than adequate to prove that she aided and abetted in the killing of Hall and was not, therefore, entitled to a judgment of acquittal. See Shockey v. State, 338 So.2d 33 (Fla.3d DCA 1976) (upholding first degree murder conviction of defendant who, knowing that one Kirsch planned to kill the victim, drove the victim to train station while Kirsch hid in the back of the car and watched while Kirsch killed the victim); McClamrock v. State, 327 So.2d 780 (Fla.3d DCA 1976) (upholding second degree murder conviction of defendant who, knowing that McClamrock, her husband, intended to kill her ex-husband, Stevens, went with McClamrock to Stevens' house and asked Stevens to step outside where he was killed by McClamrock). See also Foxworth v. State, 267 So.2d 647 (Fla. 1972); Wadsworth v. State, 136 Fla. 134, 186 So. 435 (1939); Smith v. State, 129 Fla. 388, 176 So. 506 (1937); Henry v. State, 81 Fla. 763, 89 So. 136 (1921); I.R. v. State, 385 So.2d 686 (Fla.3d DCA 1980).

III.

The Duress Instruction
Wright requested that the jury be instructed:
"I charge you that if you believe from the evidence that at the time of the death of Barbie Hall the defendant Dorothy Wright was then subjected to real, present danger, existent at the time, imminent and not to be avoided, or under all the circumstances shown in the evidence the defendant Dorothy Wright had reasonable grounds to believe that such danger was real, imminent and impending and did so believe at the time of the shooting of Barbara Hall and that the defendant Dorothy Wright shot Barbara Hall because of such belief, then you may find Dorothy Wright not guilty of this charge."
The trial court denied the instruction, finding that Wright had not made the threshold showing which would entitle her to the instruction. While we agree with this ruling by the trial court, it is our view that even if such a showing had been made, Wright would not have been entitled to the instruction because duress, while available as a defense to other crimes, is not available as a defense to a charge of homicide.[6]
*498 Florida has recognized the common law defense of duress as a defense to crimes other than homicide, e.g., Hall v. State, 136 Fla. 644, 187 So. 392 (1939) (perjury); Koontz v. State, 204 So.2d 224 (Fla.2d DCA 1967) (attempted robbery). In a case of first impression in this state, the First District held that the defense is not available in a case of homicide or attempted homicide. See Cawthon v. State, 382 So.2d 796 (Fla. 1st DCA 1980). That holding finds support in other jurisdictions. See, e.g. State v. Fuller, 203 Neb. 233, 278 N.W.2d 756 (1979); State v. Taylor, 22 Wash. App. 308, 589 P.2d 1250 (1979) (under Washington statute); Jackson v. State, 558 S.W.2d 816 (Mo. App. 1978); State v. Jones, 119 Ariz. 555, 582 P.2d 645 (1978); State v. Toscano, 74 N.J. 421, 378 A.2d 755 (1977) (dicta); State v. Kearns, 27 N.C. App. 354, 219 S.E.2d 228 (1975) (dicta); Annot., 40 A.L.R.2d 908 (1955); 40 Am.Jur.2d, Homicide § 119 (1968); 40 C.J.S., Homicide § 113 (1944).
In Jackson v. State,[7] supra, at 820, the Missouri Court of Appeals stated the rationale for the unavailability of a duress defense to murder:
"The common law has steadfastly refused to recognize any compulsion, even the threat of death, as sufficient to excuse taking the life of another.... Legal recognition of duress as a defense to crimes other than homicide necessarily assumes a working hypothesis that a harm or crime of greater magnitude is avoided when the subjected person succumbs to the duress. This hypothesis disappears when duress is sought to be invoked as a defense in a homicide case."
The rationale is sound. The paucity of cases which have addressed the issue is, hopefully, a reflection that the rule that duress will never justify the killing of an innocent third party accords with the mores of our society. We unhesitatingly adopt the rule that duress is not a defense to an intentional homicide.[8]

*499 IV.

Duress As Negating State of Mind
Having decided that duress is not a defense to the intentional killing of another, we now address the question of whether evidence of duress, even though imperfect, see n. 6, supra, which serves to show that Wright did not act with a premeditated design to kill Hall or with a depraved mind, requires us to reduce Wright's conviction for second degree murder to a conviction for manslaughter.[9] The answer to this question depends, in our view, on whether a person such as Wright who aids and abets another in the commission of murder must herself be shown to have the state of mind required for the homicide. Because we find the rule in Florida to be that aiders and abettors may be convicted either upon proof of their own state of mind or upon proof that they knew that the person aided had the requisite state of mind, evidence that the aider and abettor knew that the principal had a premeditated design to kill or a depraved mind, will support the aider and abettor's conviction for first or second degree murder.[10]
In Savage v. State, 18 Fla. 909, 962 (1882), the court stated:
"[T]o constitute a principal in the second degree[11] there must be not only a presence and an aiding and abetting, but a participation in the felonious design, or at least, the offense must be within the compass of the original intention. This is the doctrine of common law. The charge should be in effect that if [the defendant] was present aiding and abetting [the perpetrator] knowing or believing that [the perpetrator] intended to kill [the victim], or with a `premeditated design' to kill [the victim] aided and abetted [the perpetrator] in his act, he was equally guilty with [the perpetrator]." (emphasis supplied).
Savage is followed in McCoy v. State, 40 Fla. 494, 24 So. 485 (1898),[12] and both are carried forward in Henry v. State, 81 Fla. 763, 89 So. 136 (1921), where the Florida Supreme Court again held that "in order to convict one of murder in the first degree, whether as a principal in the first or second degree, [the State must show] that the defendant actually entertained a premeditated *500 design to kill the deceased, or know that the person aided entertained such design." (emphasis supplied). Later cases, see e.g., Ryals v. State, 112 Fla. 4, 150 So. 132 (1933); Hutchinson v. State, 309 So.2d 184 (Fla. 1st DCA 1975), citing to Henry and Savage, abbreviate those holdings with the statement that the aider and abettor "must also be a participant in the felonious design with which the killing is done." To participate in the felonious design is by the Savage definition to act knowing or believing that the principal intended to kill the victim with one one's own design to kill the victim.[13] Since it is abundantly clear that when Wright aided La Rocca, she knew that La Rocca intended to kill Hall, which knowledge, unlike her own intent, is undiminished by duress, her conviction for second degree murder must stand.
Affirmed.
NOTES
[1] No challenge was made below or is made here to the voluntariness of Wright's testimony before the grand jury or her signed waiver of immunity.
[2] La Rocca's conviction for first degree murder was affirmed by this court in La Rocca v. State, 401 So.2d 866 (Fla. 3d DCA 1981).
[3] A Dade County Public Safety Department detective testified that on February 14, 1979, more than two weeks after the murder, he received an anonymous phone call in which the male caller told him that a girl named Barbara Hall had been shot and murdered by a girl named Dodie Wright. The detective unsuccessfully tried to find the body at the stated location. He then went to the Busy Bee Car Wash, where he asked about Dorothy Wright. Another detective testified that in investigating the matter anonymously communicated to his colleague, he went to Wright's residence at about 5:30 p.m. on February 15. She was not home. He left his business card with his name and Dade County Public Safety Department, Homicide Section, on it, along with a message for Wright to contact him. Finally, a third detective testified that he spoke to Wright at the police station at approximately 1:00 a.m. on February 16. Wright told him that she had seen Joseph La Rocca murder a girl named Barbie approximately three weeks earlier and that La Rocca had told her that Barbie had to be killed and requested that she kill her. Wright said that she told La Rocca she would not do the killing, but agreed that Barbie needed to be killed and said she would come along. On the occasion of this pre-grand jury statement, Wright said that La Rocca fired all the shots into the victim. She said she would take the officers to where the body was, and directed them there without difficulty. The body of Barbie Hall was discovered.
[4] Wright's self-serving, but uncontradicted, grand jury testimony bearing on this issue includes her statements that (a) "Well, I made up my mind that I wasn't going to kill her, I was just trying to keep myself alive."; (b) "He handed me the gun and asked if I was ready ... [I said] no, but I guess I have to be. She was looking in her purse for something, I guess it was to get a cigarette or something and when I knew she wasn't looking, I put the gun up and shot her."; (c) "I don't know [where I hit her], but I aimed for her arm and he told me I shot her in the arm, so I took it at that."; (d) "All I thought about was doing what he said so nobody would get hurt. It didn't work out that way."
[5] The jury was properly instructed that: "A person may commit a crime by his own personal act or through the act or acts of another person. Any person who knowingly aids, abets, counsels, hires or otherwise procures the commission of a crime is equally guilty with the one who actually performs the criminal act whether he is or is not present at the commission of the offense. However, for one person to be guilty of a crime physically committed by another, it is necessary that he have a conscious intent that the criminal act shall be done and that, pursuant to that intent he do some act or say some word which was intended to and which did incite, cause, encourage, assist, or induce another person to actually commit the crime."
[6] Even were the defense available, it was not established so as to require an instruction. Stevens v. State, 397 So.2d 324 (Fla. 5th DCA 1981); Cawthon v. State, 382 So.2d 796 (Fla. 1st DCA 1980); United States v. Wood, 566 F.2d 1108 (9th Cir.1978); State v. Moore, 237 Ga. 269, 227 S.E.2d 241 (1976); State v. Kearns, 27 N.C. App. 354, 219 S.E.2d 228 (Ct. App. 1975). Accord, Hall v. State, 136 Fla. 644, 187 So. 392 (1939); Koontz v. State, 204 So.2d 224 (Fla.2d DCA 1967). The evidence did not show that the danger to Wright, had she not succumbed to La Rocca's threats, was imminent or impending. She worked alongside the victim, Hall, on the afternoon of the murder and could have warned her, but did not; she was outside of La Rocca's presence for several hours that afternoon; she neither called the police nor told her mother nor attempted to flee. In short, the defendant by her own admission, made no attempt to warn the victim, contact the authorities, or escape from La Rocca's control, despite ample opportunity to do so. In Hall and Koontz, convictions for perjury and attempted robbery were reversed because the trial court failed to give the very instruction which Wright requested in the present case. The instruction, of course, is proper unless the evidence is such that the trial court can decide, as a matter of law, that the defendant could not reasonably believe that the danger was real or impending. Even if Wright had reasonable grounds to believe that the danger was real, but, as a matter of law, could not reasonably believe that the danger was impending, then the instruction is not required. In this context, the meaning of impending is not merely temporal, i.e., about to take place, but includes whether there is, no matter the lapse of time, a reasonable opportunity to escape the compulsion without committing the crime. Thus, while in Hall the threats made against the defendant to send her and her son to the penitentiary were made sometime prior to her committing perjury under the duress of these threats, it could not be said, as a matter of law, despite the lapse of time, that Mrs. Hall had a reasonable opportunity to extricate herself from the danger, because the very threats were made by the State Attorney and the sheriff. An imminent danger is one which cannot be guarded against by calling for the protection of the law. Black's Law Dictionary 676 (5th ed. 1979). In Koontz, while the recited facts indicate that the duress exerted upon Koontz extended over a considerable period of time, it is not clear from the opinion whether Koontz had either time or opportunity from the moment the crime was proposed to escape from the compulsion without committing the actual crime of attempted robbery. However, if Koontz is read to mean that continued threats without regard to their imminence in relation to the crime are enough to warrant the duress instruction, then Koontz stands alone for the proposition that the danger need only be real, not impending, a proposition which finds no support in Hall or the cases cited, supra, and indeed, at least facially, none in Koontz.
[7] In Jackson, the defendant claimed that he shot and killed a motel owner during the course of a robbery only because one of his companions threatened to kill him if he did not. The court held that the defense of duress was unavailable as a matter of law.
[8] Wright was charged with and defended against first degree murder by premeditated design, which, of course, involves an intent to kill. Where duress is offered as a defense to first degree murder under a felony murder charge, a different question is presented, since duress is a recognized defense to the underlying felony, and the rationale of the rule prohibiting the duress defense in the crime of homicide appears inapplicable. See Jackson v. State, supra; People v. Merhige, 212 Mich. 601, 180 N.W. 418 (1920). We need not decide this question in the present appeal. We note, however, that in the case of intentional homicide, duress is no more available to an aider and abettor than it is to the principal, since the intention of the aider and abettor to participate in the homicide must be shown. State v. Dissicini, 66 N.J. 411, 331 A.2d 618 (1975).
[9] It has been suggested that while an intentional killing of an innocent third party is always criminal, duress should serve at least to mitigate it to something less than murder. Several states by statute allow the duress defense to reduce murder to manslaughter. W. LaFave & A. Scott, Jr., Criminal Law, § 77, at 585 (1972). In the present case, because the state introduced evidence of duress through Wright's grand jury testimony, she had the benefit of this evidence being heard by the jury and was likely the recipient of a jury pardon when convicted of the lesser offense of second degree murder. However, consistent with our holding, supra, that duress is not an available defense to an intentional killing, and our holding, infra, that it is not available to an aider and abettor of an intentional killing, evidence of duress in such a prosecution is inadmissible.
[10] Compare e.g., Rizzolo v. Commonwealth, 126 Pa. 54, 17 A. 520 (1889), where the court held that the jury was properly instructed to consider duress as it affected the aider and abettor's premeditated intent to commit murder.
[11] Principals in the second degree have been abolished. The modern-day concept of aiding and abetting includes former principals in the second degree and accessories before the fact which were distinguished by the fact that the principal was present at the scene of the crime. Today all aiders and abettors are equally responsible as principals. See Prather v. State, 182 So.2d 273 (Fla.2d DCA 1966).
[12] In McCoy v. State, supra, the court held that "[i]n order to hold one guilty [as an-aider and abettor] he must not only be present but he must be aiding, abetting, advising, encouraging or assisting such third person to commit the crime, having himself a premeditated design to effect the death of the person killed, or knowing or believing that such person intended to kill the deceased." 24 So. at 487 (emphasis supplied).
[13] In Killingsworth v. State, 90 Fla. 299, 105 So. 834 (1925), the court, citing Savage, McCoy and Henry, stated, in dicta, that in the case of murder, premeditated design must be proven against a principal in the second degree. If the court meant to say felonious design, the dicta is correct; if not, the dicta is simply wrong as omitting the alternative proof that the aider and abettor knew of the principal's design.