753 So.2d 609 (2000)
Deidre M. HUNT
v.
STATE of Florida.
No. 5D98-1904.
District Court of Appeal of Florida, Fifth District.
February 18, 2000.
*610 Carey Haughwout, of Tierney & Haughwout, of Tierney & Haughwout, West Palm Beach, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Kellie A. Nielan, Assistant Attorney General, Daytona Beach, for Appellee.
GRIFFIN, J.
This is another appeal arising out of a series of crimes perpetrated by the defendant, Deidre M. Hunt, through her association with Konstantinos X. Fotopoulos. See Hunt v. State, 613 So.2d 893 (Fla. 1992); Fotopoulos v. State, 608 So.2d 784 (Fla.1992), cert. denied, 508 U.S. 924, 113 S.Ct. 2377, 124 L.Ed.2d 282 (1993).
In the Summer of 1989, Deidre M. Hunt ["Hunt"], then twenty years old, moved to the Daytona Beach area from New Hampshire to live with her boyfriend, but the relationship soon ended. Hunt became acquainted with Lori Henderson ["Henderson"] and Tony Calderoni. After a brief sexual relationship, Tony Calderoni rented Hunt an apartment and provided her a job at "Top Shots," a pool hall he managed for the owner, Konstantinos X. Fotopoulos ["Fotopoulos"]. Soon thereafter, Hunt began an affair with Fotopoulos, who in turn rented her an apartment, gave her money, and bought her clothes.
Fotopoulos was married to Lisa Fotopoulos, and lived with Lisa, her mother, and brother, in her mother's home. Lisa owned a business on the boardwalk in Daytona Beach called "Joyland Amusement Center." Sometime towards the end of October 1989, Lisa learned of Fotopoulos' affair with Hunt and she demanded that Fotopoulos fire Hunt from Top Shots. When he denied the affair, she announced her plan to file for divorce.
On November 1, 1989, while working at Joyland, Lisa was attacked by a man later identified as Teja James. James pointed a gun at Lisa and told her he would shoot her if she did not heed his command. Lisa, however, managed to escape and notified the police. Lisa identified James' photograph and the search began for his capture.
Four days later, Lisa awoke to a loud noise. All she could remember was seeing Fotopoulos with a gun in his hand and a young man, later identified as Bryan Chase, lying shot at the foot of her bed *611 with his finger on the trigger of a gun. Fotopoulos had shot Chase several times after shooting Lisa in the head.
The police responded to the scene and initially classified the crime as a home invasion gone wrong and a self-defense shooting by Fotopoulos. The police soon became suspicious, however, that the incident was somehow related to the events at Joyland. As part of their investigation, the police contacted Hunt and Henderson. While at the police station, Hunt confessed to her involvement during an audio-taped interview.
She informed them of the extent of Fotopoulos' criminal activity, including counterfeiting, stealing cars and bank robberies. Hunt further told the police that Fotopoulos was a "trained assassin," had tortured then killed approximately eight people and owned numerous weapons, including assault rifles, guns, and grenades.
Hunt explained that the elaborate plans to kill Lisa had begun with another murder, that of Kevin Ramsey ["Ramsey"] a month earlier. Ramsey was a former Fotopoulos employee whom Fotopoulos believed was blackmailing him over his counterfeiting enterprise. The police were not aware that Ramsey was missing.
Hunt detailed the events of Ramsey's murder as follows: Fotopoulos, Ramsey and Hunt went out to the woods to an old rifle range. Fotopoulos tied Ramsey to a tree, gave a .22 pistol to Hunt, pointed his AK-47 automatic rifle at her head and demanded she shoot Ramsey. She shot him several times. Hunt informed the police that Fotopoulos videotaped the shooting and still had the tape in his possession. Hunt then guided the police to Ramsey's severely decomposed body.
Hunt's friend, Henderson, also testified at trial. Henderson testified that she learned of the plan to kill Lisa from Hunt, who also told her the couple planned to move into Lisa's house after her death. Henderson testified that prior to the Ramsey murder, Hunt informed her that Fotopoulos planned for her to kill someone so he could in turn videotape it for protection. Hunt also informed Henderson that it would be Ramsey.
Hunt presented expert testimony that Hunt's mother suffered from multiple personality disorder with eleven separate personalities. She also presented testimony, based upon her childhood experiences and her relationship with Fotopoulos, that she suffered from post-traumatic stress disorder and battered woman syndrome. Hunt's experts testified that Fotopoulos inflicted ritualistic torture on Hunt by cutting her with razors, sucking her blood, throwing knifes, burning her with cigarettes and an iron, poking her with needles, and threatening her with a gun. One expert testified that as a result of her mental illness, Hunt did not understand the consequences of her actions and she believed she had no alternative but to obey Fotopoulos.
Finally, Hunt published admissions made by the State in the Fotopoulos trial. In particular, Hunt published statements by State Attorney John Tanner describing Fotopoulos' relationship with Hunt as a "significant beginning of a pattern of intimidation and terror inflicted on the witness to terrorize her and break down her will ultimately and obtain complete control of her, ultimately resulting in her carrying out the various crimes." Tanner also said that Hunt's testimony was to be introduced in the trial against Fotopoulos "for the purpose to show a clear pattern of physical assault, abuse, intimidation, and coercionand the direct and primary cause for Deidre Hunt's criminal activity." The State also asserted in the Fotopoulos trial that his threats "had an impact on her; in effect, paralyzed her; stopped her from feeling she could go to anyone or talk to anyone or escape from the circumstances...." Tanner described "a continuing pattern of domination, threat, and intimidation, which ultimately deprived Deidre Hunt of the ability to even resist, *612 let alone disobey." The jury returned a verdict finding Hunt guilty as charged.
In the judgment and sentencing order, the lower court made the following findings:
The defendant murdered Kevin Ramsey execution-style while his hands were bound behind his back and he was tied to a tree. The evidence at trial showed the defendant murdered Ramsey calmly, after cool reflection, and that the murder of Ramsey was not an act prompted by emotional frenzy, panic, or a fit of rage. The evidence showed the defendant and codefendant Fotopoulos had a prearranged design to murder Ramsey. The videotape introduced at trial showed the defendant shooting the victim three times in the chest and once in the head at point blank range. According to the defendant's videotaped statement introduced at the guilt phase of trial when she went to the woods with codefendant Fotopoulos and Ramsey and she believed she was only going to shoot around Ramsey's feet while he was tied to a tree. She stated that once they stopped the car defendant Fotopoulos sent Ramsey ahead to see if anyone was in the area. Codefendant Fotopoulos then told her before they left the car that she was going to murder Ramsey. The three then walked a short distance into the woods, Ramsey's hands were tied behind his back and he was tied to a tree. Codefendant Fotopoulos then turned on the video camera and a flashlight. The beginning of the videotape shows the defendant standing near Ramsey. She tells codefendant Fotopoulos not to shine the flashlight in her eyes. Codefendant Fotopoulos adjusts the light and focuses the camera. He tells the defendant to step closer to Ramsey and she does so. When codefendant Fotopoulos tells her to begin, the defendant calmly pulls a .22 caliber pistol from her jacket pocket and shoots the victim. By the defendant's own admission she knew she was going to carry out an execution-style murder at least from the time she left the car. She had previously expressed to her friends that she was willing to do this execution-style killing when the time came. The Court finds this is proof beyond a reasonable doubt of heightened premeditation and deliberate ruthlessness.
The court sentenced Hunt on count I of the Indictment for the first-degree murder of Kevin Ramsey to life imprisonment with twenty-five years before the possibility of parole, and to life imprisonment with twenty-five years before the possibility of parole on count II for the first-degree murder of Brian Chase, to run consecutively with count I. The court subsequently sentenced Hunt on the remainder of her offenses: on count III of the Indictment, conspiracy to commit first-degree murder, the court sentenced Hunt to thirty years in prison, to run concurrently with count IV; and the court sentenced Hunt to thirty years in prison on count IV, solicitation to commit the first-degree murder of Lisa Fotopoulos, to run concurrently with count III.
Hunt has raised two related issues on appeal, namely that the lower court erred in refusing to give either of two requested jury instructions directed at her contention that the only reason she killed Kevin Ramsey was that Fotopoulos had a gun pointed at her head and that she killed Ramsey to avoid being killed. The first of these proposed instructions was designed to supplement the standard instruction on premeditation to include the requirement that premeditation be uninfluenced by a dominating passion sufficient to obscure reason. The second was an instruction that necessity is a defense to homicide.[1]
We find no merit to Hunt's claim that she was entitled to a "necessity" instruction. *613 We agree with the State that the necessity defense does not apply in this case; rather the facts support a claim of duress. The Supreme Court described the difference in United States v. Bailey, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980):
Common law historically distinguished between the defenses of duress and necessity. Duress was said to excuse criminal conduct where the actor was under an unlawful threat of imminent death or serious bodily injury, which threat caused the actor to engage in conduct violating the literal terms of the criminal law. While the defense of duress covered the situation where the coercion had its source in the actions of other human beings, the defense of necessity, or choice of evils, traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils. Thus, where A destroyed a dike because B threatened to kill him if he did not, A would argue that he acted under duress, whereas if A destroyed the dike in order to protect more valuable property from flooding, A could claim a defense of necessity. See generally LaFave & Scott 374-384.
Presumably, Hunt prefers "necessity" over duress because duress is not a defense to homicide. Bailey, 444 U.S. at 409-10, 100 S.Ct. 624. In Wright v. State, 402 So.2d 493 (Fla. 3d DCA 1981), the third district held on similar facts that duress is not available as a defense to intentional homicide, including second degree murder. At her trial, Wright requested the jury to be instructed as follows:
I charge you that if you believe from the evidence that at the time of the death of Barbie Hall the defendant Dorothy Wright was then subjected to real, present danger, existent at the time, imminent and not to be avoided, or under all the circumstances shown in the evidence the defendant Dorothy Wright had reasonable grounds to believe that such danger was real, imminent and impending and did so believe at the time of the shooting of Barbara Hall and that the defendant Dorothy Wright shot Barbara Hall because of such belief, then you may find Dorothy Wright not guilty of this charge.
Wright, 402 So.2d at 497. The trial court denied the instruction. The third district affirmed, and "unhesitatingly" reaffirmed the rule that duress is not a defense to an intentional homicide. Id. at 498. In so holding, the third district commented on the "paucity" of cases which had addressed the issue, indicating its hope that the lack of cases indicated a public policy against the defense as it applied to murder and reflected "the rule that duress will never justify the killing of an innocent third party accords with the mores of our society." Id. Finally, the third district articulated the rationale behind the unavailability of the defense to murder:
The common law has steadfastly refused to recognize any compulsion, even the threat of death, as sufficient to excuse taking the life of another.... Legal recognition of duress as a defense to crimes other than homicide necessarily assumes a working hypothesis that a harm or crime of greater magnitude is avoided when the subjected person succumbs to the duress. This hypothesis disappears when duress is sought to be invoked as a defense in a homicide case.
Wright, 402 So.2d at 498 (quoting Jackson v. State, 558 S.W.2d 816, 820 (Mo.Ct.App. 1977)).
See also 1 Charles E. Torcia, Wharton's Criminal Law § 90 (15th ed.1993); Wayne LaFave & Austin Scott, Jr., Criminal Law § 77, at 585 (1st ed.1972).
Hunt's second contention is that the trial court reversibly erred when it opted for the standard jury instruction on premeditation instead of her proposed jury instruction that included the notion of a "dominating passion." In essence, she *614 contends that there was evidence at trial that Hunt's fear of Fotopoulos "prevented her from forming the necessary premeditation" to sustain a charge of first-degree murder.
In support of her theory, Hunt relies on language in Forehand v. State, 126 Fla. 464, 171 So. 241 (1936) and Tien Wang v. State, 426 So.2d 1004 (Fla. 3d DCA), review denied, 434 So.2d 889 (Fla.1983):
The State must prove beyond a reasonable doubt that the premeditation is not influenced by a dominating fear sufficient to cloud reason.
In Forehand, the supreme court reversed the defendant's conviction for first-degree murder upon finding insufficient evidence of premeditation and remanded for a new trial to determine whether the defendant's acts constituted murder in the second degree or manslaughter. Forehand, 171 So. at 244. In so holding, the supreme court recognized that premeditation is the essential element of first-degree murder but that premeditation may be negated by a finding of what is today referred to as "heat of passion:"
It is also true that a well-defined purpose to kill may be induced, compelled, or constrained by anger of such degree as for the moment to cloud the reason and momentarily obscure what might otherwise be a deliberate purpose by its impelling influence....
* * *
As the element of premeditation is an essential ingredient of the crime of murder in the first degree, it is necessary that the fact of premeditation uninfluenced or uncontrolled by a dominating passion sufficient to obscure the reason based upon an adequate provocation must be established beyond a reasonable doubt before it can be said that the accused was guilty of murder in the first degree as defined by our statute.
Forehand, 171 So. at 243.
In Wang, the third district quoted the above passage from Forehand to support its conclusion that the evidence of an altercation in that case between the defendant and the victim was equally consistent with "heat of passion" as it was with premeditation, precluding a conviction for first-degree murder. Wang, 426 So.2d at 1007; see also Clay v. State, 424 So.2d 139, 141 (Fla. 3d DCA 1982)(evidence did not sustain conviction for first-degree murder where the defendant operated under a "dominating passion" and fear of the victim when she killed him), review denied, 434 So.2d 889 (Fla.1983).
Hunt requested the following instruction, tracking the language in Forehand:
As the element of premeditation is an essential ingredient of the crime of murder in the first degree, it is necessary that the fact of premeditation uninfluenced or uncontrolled by a dominating passion sufficient to obscure reason based upon an adequate provocation must be established beyond a reasonable doubt before it can be said that the defendant is guilt of murder in the first degree.
The State, however, argued that the special instruction was confusing and unnecessary since the standard jury instructions on premeditation and the instructions on justifiable and excusable homicide included similar language and adequately instructed the jury. Accepting the State's argument, the trial court rejected Hunt's proposed instructions and gave the justifiable and excusable homicide instruction and the standard jury instruction on premeditation:
"Killing with Premeditation" is killing after consciously deciding to do so. The decision must be present in the mind at the time of the killing. The law does not fix the exact period of time that must pass between the formation of the premeditated intent to kill and the killing. The period of time must be long enough to allow reflection by the defendant. The premeditated intent to kill must be formed before the killing.

*615 The question of premeditation is a question of fact to be determined by you from the evidence. It will be sufficient proof of premeditation if the circumstances of the killing and the conduct of the accused convince you beyond a reasonable doubt of the existence of premeditation at the time of the killing.
In Kilgore v. State, 688 So.2d 895, 897 (Fla.1996), cert. denied, 522 U.S. 832, 118 S.Ct. 103, 139 L.Ed.2d 58 (1997), the supreme court addressed a similar situation. There, the defendant appealed the trial court's denial of his special "heat of passion" exception to premeditation. In that case, the defendant was convicted of the first-degree murder of his prison mate homosexual lover. Kilgore, 688 So.2d at 896. The State presented testimony that the defendant laid in wait outside the lover's cell and stabbed him three times with a shank knife when he returned. Id. at 896-97. After stabbing his lover, the defendant poured caustic liquid in his lover's face and mouth. Id. at 897. He immediately confessed to authorities that "I stabbed the bitch." Id.
At his trial, the defendant requested a special "heat of passion" jury instruction which provided:.
An intentional unlawful killing is not premeditated murder if it was committed while the defendant was in the heat of passion brought on by sudden provocation sufficient to produce in the mind of an ordinary person the highest degree of rage, anger, or resentment that is so intense as to overcome the use of ordinary judgment thereby rendering a normal person incapable of reflection.
Id. at 898. The trial court rejected the defendant's special instruction, opting instead, as in this case, to issue standard jury instructions on premeditation and "heat of passion" in the context of excusable homicide. Id. at 897. The defendant appealed, arguing that his special instruction would have explained "heat of passion" as a negating factor of premeditation and that by not so instructing the jury the trial court denied his right to due process. Id. The supreme court, however, disagreed, finding the standard jury instructions sufficient to instruct the jury on "heat of passion" and premeditation:
Kilgore avers that he was denied due process under both the state and federal constitutions when his request for a special heat-of-passion instruction was denied. The special instruction would have explained heat of passion in the context of intentional homicide. Essentially, the instruction would have clarified that a person acting under the heat of passion is, in some circumstances, incapable of premeditation. Instead, the trial judge utilized the standard jury instructions. Included in these instruction was a discussion of heat of passion in the context of excusable homicide. Further, the requirement of premeditation in a first degree conviction was repeatedly emphasized. This Court has acknowledged that the standard jury instructions are sufficient to explain premeditation. Spencer v. State, 645 So.2d 377, 382 (Fla.1994). We also have ruled that the trial court does not necessarily abuse its discretion in denying a special heat-of-passion instruction. Kramer v. State, 619 So.2d 274, 277 (Fla.1993). After viewing these facts, we conclude that there is no indication that the trial court erred by refusing the requested instruction. The necessary elements of premeditation were presented with the standard instruction and the trial court was well within its prerogative to refuse a separate, and possibly confusing, instruction.
Id. at 898.
As in Kilgore, the jury instructions in this case included the standard jury instruction on premeditation and a discussion of "heat of passion" in the instruction on excusable homicide.[2] While Hunt's proposed *616 instruction, like Kilgore's, may have elaborated on the effect that extreme emotion might have on the ability to premeditate, the convoluted language taken from the Forehand opinion may have led to confusion. The trial court was well within its prerogative to deny the proposed instruction.
In recognition of Kilgore, Hunt urges that in this particular case, because the court also instructed the jury that coercion is not a defense to homicide, an instruction on "heat of passion" was required. We disagree. This instruction correctly informed the jury that coercion would not excuse homicide; it does not suggest that it cannot affect premeditation. The question whether Hunt made a "conscious decision" to kill Kevin Ramsey after time for "reflection" in light of her emotional state is appropriately a matter for argument to the jury. Here it was fully explored during closing by counsel for Hunt. Accordingly, we affirm appellant's judgment and sentence.[3]
AFFIRMED.
JACOBUS, B., Associate Judge, concurs.
DAUKSCH, J., concurs in result only.
NOTES
[1] We note that the two requested instructions appear inherently inconsistent. "Necessity" assumes a conscious weighing of competing harms whereas the lack of premeditation defense assumes the inability to reason at all.
[2] See also State v. Nargashian, 26 R.I. 299, 58 A. 953 (1904)(B intentionally killed C because A with axe in hand threatened to kill B unless B killed C; court found B guilty of murder, not manslaughter, and rejected B's argument "that fear, like passion, may so cloud the mind as to eliminate malice."); LaFave & Scott, supra.
[3] As her last point, Hunt urges that she was sentenced in violation of North Carolina v. Pearce, 395 U.S. 711, 89 S.Ct. 2089, 23 L.Ed.2d 656 (1969), for the attempted murder of Lisa Fotopoulos. In light of the overall change in the sentencing scheme after elimination of the death sentence, we find no violation.