929 So.2d 1192 (2006)
Jimmy MICKEL, Appellant,
v.
STATE of Florida, Appellee.
No. 4D04-1482.
District Court of Appeal of Florida, Fourth District.
June 7, 2006.
*1193 Carey Haughwout, Public Defender, and Michael Antinori, Assistant Public Defender, West Palm Beach, for appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Jeanine M. Germanowicz, Assistant Attorney General, West Palm Beach, for appellee.
GROSS, J.
Jimmy Mickel appeals his convictions of three counts of armed kidnapping and two counts of armed robbery. We affirm, finding no error in the trial court's refusal to charge the jury on the defense of duress.
This case arose from a double homicide at a Waffle House on March, 11, 2002. Barbara Nunn, an eyewitness who survived the shooting, worked at the restaurant with Christine De La Rosa, a waitress, and Willy Absolu, a cook. Nunn knew Mickel from working with him at the Waffle House. Nunn and Mickel often discussed a nightclub where Mickel held a second job as a doorman. Nunn went to the club several times and Mickel let her in for free.
At 4:30 a.m., Mickel and Gerhard Hojan[1] entered the Waffle House. Nunn was familiar with Hojan as Mickel's sidekick. She described Hojan as a "gofer," who did everything Mickel told him to do. When Mickel worked at the Waffle House, Hojan often sat in a booth, waiting for Mickel to finish his shift.
Mickel and Hojan sat down in a booth, ordered, and ate. When they finished, Mickel stood up and walked out of the restaurant. Hojan went to the cash register to pay. Before handing over the check, Hojan looked outside to Mickel in the parking lot. De La Rosa reached to take the bill from Hojan. At that point, Nunn heard a clicking sound.
Nunn turned and saw Hojan pointing a gun at De La Rosa. De La Rosa pleaded with Hojan, saying, "I have a six month old son named Kyle. I want to see him again."
Mickel reentered the restaurant, walking quickly, hugging the wall, and heading toward the restrooms. Though Hojan and Mickel did not speak, Nunn felt that Mickel was in control. She testified that Mickel was the mastermind who thought of everything, while Hojan waddled behind like a dog on a leash.
*1194 Hojan ordered Nunn, De La Rosa, and Absolu to the back of the restaurant. The three employees headed single file through the kitchen. As they went through the swinging door, Nunn saw Mickel using long bolt cutters to break the lock on the storage area. Nunn surmised that Mickel brought the bolt cutters with him, because she had never before seen bolt cutters in the restaurant. After Mickel broke the lock, the door opened and everyone walked into the storage area. Nunn asked if they were going to be okay. Mickel did not respond. Hojan told the three employees to go into the back freezer. The trio complied and the freezer door closed.
Soon, Hojan returned to the freezer and asked for the employees' cell phones. None of the employees had cell phones, so Hojan left. When he returned, he told the employees to put their money on the shelf. Nunn placed about $40 on the shelf, De La Rosa put down between $140 and $160, and Absolu said he had no money on him. Hojan took the cash and left, closing the door behind him.
When Hojan returned to the freezer, he told the victims to get on their knees and put their hands on their heads. Absolu and De La Rosa complied but Nunn did not. She tried to talk Hojan out of shooting them, but he kept telling her to turn around. Hojan shot Nunn and she fell. Nunn opened her eyes and before closing them again, she saw De La Rosa get shot.
The next thing Nunn remembered was knocking away Absolu's foot or leg. She crawled through the freezer and peeked outside to see if Mickel or Hojan were still around. Nunn went out the back door and made it across the parking lot to a gas station, where the attendant called 911.
The police searched the Waffle House shortly after the shooting. They found the bodies of Absolu and De La Rosa in the freezer. De La Rosa had gunshot wounds to the neck and breast. Absolu had gunshot wounds to the head, neck, and arm. A black metal drop box was dangling behind the cash register, with its padlock cut off. There were three other cut padlocks, two empty cash drawers, and coins and coin wrappers scattered in one of the offices. A crime scene technician collected five bullet casings from the cooler. An expert witness testified that (1) a gun found in Hojan's truck fired the bullets that killed the victims, and (2) at least two of the locks were cut by bolt cutters retrieved from Hojan's truck.
At 6:40 a.m. on the morning of the shooting, Hojan entered a convenience store and used cash, with much of it in small change, to purchase two money orders for $411.56 each. This transaction was captured on a videotape; the tape showed Mickel walking around a truck parked at the gas pumps outside.
Later that morning, Mickel and Hojan went to a Wal-Mart to shop for shoes. They each bought a pair and discarded the shoes they had worn at the Waffle House.
After his arrest, Mickel gave a taped statement to the investigating detectives. His version of the events was that when he woke up at 3:00 a.m., Hojan said he was hungry and wanted a waffle. Mickel and Hojan drove to the Waffle House. After they finished eating, Hojan got up to pay and Mickel went outside. When he turned back, Hojan was pointing a gun at the blonde waitress. Mickel went back inside as Hojan directed the employees to the back of the restaurant. Mickel claimed that Hojan then told him to get the bolt cutters from the car. Mickel heard several thumps, which he said did not sound like gunfire, but rather like boxes being moved.
In the statement, Mickel said he went outside to the truck, got the bolt cutters, came back inside and cut the padlocks to *1195 the manager's office and the cash drawer inside. He placed the money in a white plastic bag that Hojan held. The men left through the back door. Hojan and Mickel drove back to their house. On the way, there was some conversation about the employees knowing who Mickel and Hojan were and Hojan told Mickel, "I took care of them."
Mickel said that he was shocked about what happened, and scared that he and Hojan would get in trouble because they had pulled a gun and robbed the place and Hojan had killed people. Mickel claimed he only went along with the robbery "to be cool."
Mickel's fiancée, law student Shannon Murphy, testified that she lived with Mickel and Hojan for almost two years. She said that Hojan and Mickel were good friends and that Hojan used to follow Mickel around like a big puppy. Murphy lent Hojan one of her textbooks about serial killers. Hojan and Mickel were at the trailer when Murphy went to bed on the night of the shootings.
Murphy heard about the Waffle House incident the next day at school. Unable to reach Mickel by phone, she did not talk to him until she arrived home around 8:00 p.m. She found Mickel sleeping; he had been sleeping all day. Murphy asked if he had heard about the Waffle House shootings. Mickel said he had but wanted to talk later because he was half asleep.
Mickel neither testified at trial nor put on any evidence. He requested an instruction on duress or necessity, arguing that Hojan was just trying to "get cool, so [he] could get [Hojan] to go away from [the victims];" that Mickel was a 165-pound skinny defendant and Hojan was a 350-pound armed bouncer who had been reading books about serial killers. The trial court denied the request.
The jury acquitted Mickel of the murder and attempted murder counts and found him guilty of three counts of armed kidnapping and two counts of armed robbery.
The trial judge ordered a Pre-Sentence Investigation. The PSI recited the circumstances surrounding the crimes and detailed, among other things, Hojan's statement to the police:
[Hojan] stated that he walked out of cooler again, and that's when the defendant told him, "We can't leave any witnesses." Hojan stated that is when he walked back inside the cooler and then shot them both. He stated that when survivor Nunn was shot and fell to the floor, the other girl, referring to Christina De La Rosa, "was screaming and she started like trying to climb underneath the racks and I shot her twice."
The PSI also stated that Mickel never expressed any remorse for the victims or their families, and that he blamed his situation on the court and on State Attorney Michael Satz. A copy of the PSI was furnished to Mickel before sentencing.
At sentencing, Mickel requested a sentence below the guidelines minimum of 18.5 years.
The judge, after reviewing the PSI, hearing comments from the victim's families, considering the evidence at Mickel's trial, and considering the state's recommendation, stated:
There is no question having sat through both Mr. Hojan's trial and your trial that you were the mastermind behind this entire thing. You manipulated Mr. Hojan. He was there, he did your bidding, and the three times that he left that freezer and went back to your location, there was no question what was going on at that point. You were telling him, no witnesses, no witnesses, no witnesses, and he went back and he went *1196 forth, and he went back, and he pulled the trigger and that pull of the trigger was a cold, calculated, premeditated act that was precipitated by your direction. No question about that.
The court sentenced Mickel to five consecutive life sentences.
Mickel claims that the trial court reversibly erred in not granting his requested instruction on duress as to the robbery and kidnapping charges. We hold that Mickel was not entitled to a jury instruction on duress because the evidence at trial did not support that defense.
A defendant is entitled to have the jury instructed on the rules of law applicable to his theory of defense, such as duress, "if there is any evidence to support such instruction." Campbell v. State, 577 So.2d 932, 935 (Fla.1991). "The trial judge should not weigh the evidence for the purpose of determining whether the instruction is appropriate." Smith v. State, 424 So.2d 726, 732 (Fla.1982). The trial court should examine the evidence in the light most favorable to the defendant to decide whether the necessary elements of the defense have been placed before the jury.
To be entitled to a charge on the defense of duress,[2] the defense version of the evidence must demonstrate six elements:
1) the defendant reasonably believed that a danger or emergency existed that he did not intentionally cause; 2) the danger or emergency threatened significant harm to himself or a third person; 3) the threatened harm must have been real, imminent, and impending; 4) the defendant had no reasonable means to avoid the danger or emergency except by committing the crime; 5) the crime must have been committed out of duress to avoid the danger or emergency; and 6) the harm the defendant avoided outweighs the harm caused by committing the crime.
Driggers v. State, 917 So.2d 329, 331 (Fla. 5th DCA 2005) (citing Fla. Std. Jury Instr. (Crim.) 3.6(k)); see Hall v. State, 136 Fla. 644, 187 So. 392 (1939); Aljak v. State, 681 So.2d 896 (Fla. 4th DCA 1996); Koontz v. State, 204 So.2d 224 (Fla. 2d DCA 1967). A threatened harm that is "impending" is not only one that is "temporal, i.e. about to take place, but includes whether there is, no matter the lapse of time, a reasonable opportunity to escape the compulsion without committing the crime." Wright v. State, 402 So.2d 493, 497 n. 6 (Fla. 3d DCA 1981). An "imminent" danger is one which cannot be guarded against by calling for the protection of the law. Id. Thus, the defense does not apply where a defendant has an opportunity to escape the compulsion without committing the crime. Id.; see Gahley v. State, 567 So.2d 456, 459 (Fla. 1st DCA 1990); Corujo v. State, 424 So.2d 43, 44 (Fla. 2d DCA 1982).
Even under Mickel's version of events, the evidence demonstrates that he had many opportunities to escape Hojan's supposed compulsion, such as when he walked outside after eating, when he went to the truck to retrieve the bolt cutters, or during the times when Hojan went into the freezer. See Pflaum v. State, 879 So.2d 93, 95 (Fla. 4th DCA 2004). In his statement to the police, Mickel conceded that he was not in the restaurant when Hojan first pulled the gun; instead of leaving the area for help, he went back inside. There was no evidence that Hojan ever threatened or coerced Mickel by word or deed. Mickel *1197 told the police that he had gone along with the robbery "to be cool." This case is unlike those that required a duress instruction, where defendants described in detail the acts that compelled their commission of crimes. See Aljak, 681 So.2d at 897; Koontz, 204 So.2d at 225-26.
The fact of the triple shooting does not support the duress instruction. Mickel told the police that he did not know at the time of the crimes that Hojan had shot the victims; this would mean that, as far as Mickel knew, the victims were locked in the freezer. Mickel's statement to the police that he was "scared" refers to his conversation with Hojan in the truck as they were leaving the Waffle House. His apprehension concerned his fear of getting caught, not a fear of Hojan that compelled him to participate in the robbery scheme.
Mickel next claims that the trial court improperly relied on evidence presented at his co-defendant's trial, and not at his trial, to sentence him to life in prison. Hojan's statement implicating Mickel was described in the PSI. Furnished to the defense during discovery, the statement was the basis for the severance of the trials. Mickel had been given a copy of the PSI. The trial court properly considered the information and "afforded [Mickel] an opportunity to rebut or impeach the information." Vining v. State, 827 So.2d 201, 210 (Fla.2002).
Affirmed.
WARNER and HAZOURI, JJ., concur.
NOTES
[1] Gerhard Hojan was Mickel's co-defendant. Prior to trial, Mickel moved to sever his trial from Hojan's, asserting that Hojan had made an incriminating statement to the police that inculpated Mickel. The trial court granted the motion.
[2] The defense of duress is also called "compulsion" or "coercion." See, e.g., Koontz v. State, 204 So.2d 224 (Fla. 2d DCA 1967); Wayne R. Lafave and Austin W. Scott, Jr., Handbook on Criminal Law (1972) § 49 n. 1.