972 So.2d 941 (2007)
Michael SALAS, Appellant,
v.
STATE of Florida, Appellee.
No. 5D06-2994.
District Court of Appeal of Florida, Fifth District.
December 14, 2007.
Rehearing Denied January 23, 2008.
*943 Jeffrey L. Dees, Daytona Beach, for Appellant.
Bill McCollum, Attorney General, Tallahassee, and Kellie A. Nielan, Assistant Attorney General, Daytona Beach, for Appellee.
PLEUS, J.
Michael Salas appeals from his convictions and sentences arising out of the six-victim Deltona murders in 2004.
Salas was tried and convicted, along with codefendants Troy Victorino and Jerone Hunter, of multiple counts of first degree murder (premeditated and, felony murder), one count of conspiracy and one count of armed burglary. Salas raises four challenges on appeal. First he claims fundamental error occurred when the conjunction "and/or" was used between the defendants' names in the jury instructions on the substantive charges as well as in the principals instruction. Second, he argues reversible error occurred when his requested instruction on the defense of duress was denied. In addition, he challenges *944 two evidentiary rulings, one precluding him from cross examining the medical examiner as to the blood alcohol levels of two of the victims, and the other permitting into evidence testimony about his lack of remorse.
At the outset, this is not a case which involves a fundamental error analysis. Fundamental error is a term used by appellate courts where the error at trial is not preserved for appellate review. Crumbley v. State, 876 So.2d 599, 601, n. 2 (Fla. 5th DCA 2004). In this case, the instructional error was preserved by timely objection. Thus, our review of that issue is to determine whether the instructional error constitutes reversible error. This implicates harmless error analysis which requires us to consider the totality of the circumstances including the evidence, the instructions in their entirety, the verdict of the jury, with the ultimate determination concerning whether there exists a reasonable possibility that the error contributed to the conviction. State v. DiGuilio, 491 So.2d 1129 (Fla.1986),

THE FACTS
Salas, Victorino and Hunter were jointly tried. At trial, the following evidence was presented.
On August 6, 2004, at 6:30 a.m., a visitor to the house at 3106 Telford Lane, Deltona, found the front door open and saw a body in the living room. The visitor called 911, and sheriffs deputies responded. Inside, law enforcement personnel found the bodies of four men, two women and a small dog: Erin Belanger, Francisco Ayo-Roman and the dog were found in the back right master bedroom; Jonathan Gleason and Anthony Vega were found in the living room; Michelle Nathan was found in the front left bedroom; and Roberto Gonzalez was found lying in the doorway of the back left bedroom. All victims had signs of blunt force injuries to the head and other areas of their bodies and also knife wounds to the neck and upper torso.
Though locked with a deadbolt lock, the front door had been kicked open, and a shoeprint thirteen inches in length was found in the center of the door. A trail of blood from the front left bedroom indicated that the body of victim Vega had been dragged from that bedroom to the living room.
The medical examiner testified that the cause of death of all the victims was severe blunt force trauma to the head and that they had also suffered non-fatal blunt force injuries to other areas of their bodies. Each of the victims had several areas of severe trauma to the head, any one of which would have caused instantaneous loss of consciousness and death, The blunt force trauma was consistent with having been caused by a cylindrical object such as a baseball bat. He testified that all the knife wounds had been inflicted post-mortem.
During cross examination of the medical examiner, defense counsel told the trial court he wanted to ask the witness about blood alcohol tests conducted on victims Vega and Roman that showed levels of .08 and .12 on Vega, and .07 and .12 on Ayo-Roman. The State objected on relevancy grounds. Counsel stated that he believed it was relevant to the issue of how six people died at one time in the house. The trial court sustained the objection.
Robert Cannon, a former codefendant, was called by the State. Cannon had previously entered into a plea deal providing that in return for pleading guilty to all counts in the indictment, he would receive a life sentence and testify against the remaining defendants.
Cannon testified that he had known Salas since middle school but knew Victorino and Hunter for only a couple of days before *945 the crime. He then stated he could not answer any further questions because he was not guilty and, could not say anymore, except that he wanted a trial. The prosecutor nevertheless asked Cannon if, at the time he drove Victorino to the Telford Lane home, he (Cannon), knew the intent was to kill everyone in the house. Cannon testified "that may have been in his [Vietorino's] mind but it was not in mine." Cannon added that "me and [Salas] were in fear for our life. We had no choice. We had to go with him. Because he would've killed me and [Salas]."
When pressed by the prosecutor to "at least tell the jury" who went into the house and who had baseball bats, Cannon said all the defendants had baseball bats. At that point, Cannon refused to answer further questions.
Next, Investigator Horzepa of the sheriff's department testified that Victorino was found on Saturday, August 7, 2004, at a house on Fort Smith Boulevard in Deltona and was arrested. Hunter was with Victorino and came in voluntarily for an interview.
Horzepa testified that Hunter told him he was living with Victorino at the Fort Smith house. Hunter said he went to the Telford Lane house on the night of the murders because the people in that house had his belongings and identification and he wanted to retrieve them. He arrived at the Telford Lane house in Cannon's Ford Expedition sometime after midnight.
Hunter continued that he had an aluminum bat with him and that he knew Erin and her boyfriend lived there. He entered the front door and saw a white male in a recliner in the living room watching T.V. Hunter hit the male with the bat. Hunter could not remember how many times he hit this person, he was just swinging the bat. He stated that he hit him more than three times and probably less than twelve times.
Hunter also struck Roberto Gonzalez who was in the back bedroom and continued striking him with the bat. Hunter was just swinging and could not recall where the blows landed. Hunter said this was not supposed to happen. Hunter said he was supposed to get back his belongs which had been stolen from his residence.
A day later, Investigator Horzepa interviewed Salas who initially denied any involvement in the crimes. Salas eventually admitted he was at the Telford Lane house on the night of the murders and was armed with a baseball bat. Salas said that he hit the black male (Gonzalez) who was in the back bedroom, in the leg, arm and back three to four times, but that this was the only person in the house whom he struck. Salas denied hitting anyone in the head. The demeanor of Salas was "unconcerned" and "deadpan." Salas said he had disposed of the pants he had worn and had a change of clothes with him on the night of the murders. Salas told Horzepa where to find the bats that had been used in the commission of the crimes. In fact, Salas had helped dispose of the bats and had wiped the blood off them. Salas stated that he saw only one female, who was already dead, in the master bedroom of the Telford Lane house.
Brandon Graham, a close friend of Cannon and Salas, next testified. He first met Victorino and Hunter four days before the murders when he was in Cannon's Ford Expedition with Cannon, Salas, Victorino, Hunter and several female acquaintances. They were going to a home on Telford Lane to retrieve Victorino's belongings. Victorino said he "wanted us to fight some kids to get his stuff back." Graham, Hunter, Cannon and Salas had baseball bats while the females had knives. The females went inside the house and much yelling and cursing could be heard. The females came out with Victorino's CD case *946 but one of the people inside the house yelled they were calling the police and the group re-entered Cannon's truck and drove away.
Two days before the murders, the group, including Sales, met at a park "to fight some kids." No fight occurred but as they were driving away in Cannon's truck, they saw the kids they were planning to fight and chased them. Victorino fired a shot but the chase was broken off. Cannon let Victorino keep the gun for protection.
According to Graham, the following day the group, including Salas, returned to Victorino's residence. Victorino described a movie he had seen where "a group of niggers had ran up on some nigger's house and had beat them to death with lead pipes." Victorino said, "If I had a group of niggers to do that shit, then I would do it," and later said he would do it at the Telford Lane house. Salas said, "Yeah, I'm down for it," and started to talk to Cannon, who "shook his head yeah," and said, "I'm ready to kill me a bitch." Victorino told Hunter that he knew Hunter was "down with it" because they had taken Hunter's belongings, too. Victorino then went over a layout of the house and who would be where.
According to Graham, Victorino stated that he wanted to kill "Flaco" (victim. Ayo-Roman), and told the others "to beat the bitches, you got to beat the bitches because all they do is talk shit." They talked some more, and. Hunter suggested they should wear masks, but Victorino said, "No, because we're not gonna leave any evidence. We're gonna kill them all." They left the residence and drove around looking for bullets; there were a lot of baseball bats in the Expedition. Victorino and Hunter got out of the truck at one point and Cannon asked Graham if he was still "down for it." Graham said he really didn't know, and Salas "was like come on, B, you can't bitch out on us."
Graham called a friend and asked if he could drop by. Before Cannon, Hunter, Victorino and Salas dropped Graham off, Cannon cautioned Graham not to discuss the plan. According to Graham, Victorino told Graham the group would be back around seven o'clock to pick him up. They were supposed to kill the people at the Telford Lane house between nine and ten o'clock. The group called Graham several times that night but he had decided not to participate and asked his friend to tell them he was visiting his sick brother.
Eunice Williams, a correctional officer at the Volusia County Jail, testified that while processing Salas following his arrest, he stated he did not know how he got caught, because he had tied up his hair and had taken precautions to not get any blood on himself. He had used a bat and did not get any blood on him. When asked if he understood that he had taken a human life, he responded yes. Over objection, Williams was allowed to testify that Salas said he had no remorse. At the time of the statements, Salas appeared to be joyful and was smirking. He requested protective custody because he had killed someone.
Jerone Hunter testified that he, Cannon and Salas were wearing masks when they went to the. Telford Lane house. Hunter testified he did not hit anyone in the head with a baseball bat but that he saw Salas hit one of the victims in the head, the person who was in the front room when they first entered the house.
Salas testified in his own behalf. He testified he had been living with Cannon and that he and Cannon first met Victorino and Hunter five days before the murders occurred. On that day, a girl had called Cannon and was upset and asked for help in getting her stolen clothes back. Cannon *947 and Salas agreed to help her. The girl, along with her two sisters, directed them to a house where they picked up Victorino and Hunter. Victorino told them his clothes, as well as Hunter's and the girls', had been stolen by people on Telford Lane, from a house where he and Hunter had previously been living.
Salas related that Victorino directed Cannon to the Telford Lane house. Upon arrival, the girls went inside the house but were unsuccessful in obtaining return of the personal property. The police were called and Salas and the group left in Cannon's Expedition.
According to Salas, the day before the murders, he, Graham, Hunter and Cannon went to Victorino's residence to pick up Cannon's gun. Victorino wanted them to come inside and talked about wanting to get his belongings back and how the police were not helping. He told them about the movie where people went inside a house and beat the residents with poles and said if he had a group, he would do that to the Telford Lane people.
According to Salas, Victorino then got up and stood over them as they sat and asked each of them; one by one, if they would be "down" with this. Salas felt intimidated and said yes. The others also agreed.
On the day of the murders, Salas claimed he and Cannon discussed whether to get back together with Victorino. Salas testified he and Cannon did not believe Victorino was serious and that not once had Victorino said he wanted to kill anybody. He just seemed to want to "rough them up." Salas and Cannon picked up Victorino at 9:00 p.m. from his Fort Smith residence and ultimately ended up at the Telford Lane residence.
Victorino said he was going to go in there to get his belongings and when he came out "nobody is going to be survivors." Victorino handed everyone a bat. According to Salas, he and Cannon figured that they could not get out of it. Victorino told Salas and Cannon that if they left, they were just like those people, which he took as a threat, i.e., "if I didn't help him, he would probably hurt me too." Salas described how they entered the home. Salas claimed he did not have a chance to back out because Victorino counted to three and kicked the door in. He then testified he did not go into the house with the intent to hurt or kill anyone, but rather that, "I was just going to be there just to get his stuff."
Victorino instructed Salas to get the "dude" sitting on the floor in the back bedroom. Salas claimed he was grabbed by victim Gonzalez and struck him with the bat to "get him off me." According to Salas, Hunter beat Gonzalez with a bat some twenty to thirty times. Salas denied hitting anyone in the head and testified he struck Gonzalez only, on the back, the arm; the side, and the leg.
At the close of the evidence, Salas and Hunter each moved for a judgment of acquittal on count fourteen, cruelty to an animal, alleging the only evidence presented was that Victorino was responsible for the death of the dog. The trial court denied the motions.
The verdict forms, consistent with the indictment, provided the option of finding the defendants guilty of both first degree premeditated murder and first degree felony murder; guilty of just first degree premeditated murder; guilty of just first degree felony murder, or guilty of any one of the lesser included offenses. Salas, Hunter and Victorino were each found guilty of both first degree premeditated murder and first degree felony murder of all six victims. All three were convicted of conspiracy, and all three were convicted of armed burglary. All three were acquitted of abusing the dead body of Francisco *948 Ayo-Roman. Victorino was found guilty of abusing the body of Erin Belanger; Salas and Hunter were acquitted. Hunter was convicted of the three counts of abusing the bodies of Roberto Gonzalez, Jonathan Gleason and Anthony Vega; Salas and Victorino were acquitted of those counts. Victorino was found guilty of cruelty to an animal; Salas and Hunter were found not guilty of cruelty to an animal.
The jury recommended a life sentence for Salas on the murder counts. The trial court followed that recommendation. Victorino and Hunter each received death sentences and their appeals are pending in the Florida Supreme Court.

DOES USE OF THE "AND/OR" CONJUNCTION BETWEEN NAMES OF CODEFENDANTS IN JURY INSTRUCTIONS CONSTITUTE REVERSIBLE ERROR?
The trial court, in instructing on each of the substantive charges as well as in the principals instruction, used the conjunction "and/or" between Salas' name and the names of his codefendants Victorino and Hunter. Salas objected to use of this conjunction. The following jury instructions were given.
As to criminal conspiracy, the court instructed:
Criminal conspiracy. To prove the crime of criminal conspiracy, as charged in Count I of the indictment, the State must prove the following two elements beyond a reasonable doubt:
1. The intent of Troy Victorino and/or Jerone Hunter and/or Michael Salas was that the offense of aggravated battery, murder, armed burglary of a dwelling, and tampering with physical evidence would be committed.
2. In order to carry out the intent, Troy Victorino and/or Jerone Hunter and/or Michael Salas agreed, conspired, combined, or confederated with each other to cause aggravated battery, murder, armed burglary of a dwelling and tampering with physical evidence to be committed either by them, or one of them, or by some other person. It is not necessary that the agreement, conspiracy, combination, or confederation to commit aggravated battery, murder, armed burglary of a dwelling, and tampering with physical evidence be expressed in any particular words, or that words pass between the conspirators. It is not necessary that Troy Victorino and/or Jerone Hunter and/or Michael Salas do any act in furtherance of the offenses conspired.

As to premeditated murder, the following instruction was given:
To prove the crime of First Degree Premeditated Murder, as charged in Count I of the Indictment, the State must prove the following three elements beyond a reasonable doubt:
1. [The named victim] is dead.
2. The death was caused by the criminal act of Troy Victorino and/or Jerone Hunter and/or Michael Salas.

3. There was a premeditated killing of [the named victim].
As to first degree felony murder the jury was instructed:
To prove the crime of First Degree Felony Murder, as charged in Count II of the Indictment, the State must prove the following three elements beyond a reasonable doubt:
1. [The named victim] is dead.
2. The death occurred as a consequence of and while Troy Victorino and/or Jerone Hunter and/or Michael Salas were engaged in the commission of Burglary:
3. a. Troy Victorino and/or Jerone Hunter and/or Michael Salas was the person who actually killed [the named victim], or
b. [The named victim] was killed by a person other than Troy Victorino *949 and/or Jerone Hunter and/or Michael Salas, but Troy Victorino and/or Jerone Hunter and/or Michael Salas and the person who killed [the named victim] were principals in the commission of Burglary.
As to burglary, the jury was instructed: To prove the crime of Burglary, as charged in Count XIII of the Indictment, the State must prove the following three elements beyond a reasonable doubt:
1. Troy Victorino and/or Jerone Hunter and/or Michael Salas entered a structure owned by or in the possession of Erin Belanger and/or Francisco Ayo-Roman.
2. Troy Victorino and/or Jerone Hunter and/or Michael Salas did not have the permission or consent of Erin Belanger and/or Francisco Ayo-Roman, or anyone authorized to act for her or him, to enter the structure at that time.
3. At the time of entering the structure Troy Victorino and/or Jerone Hunter and/or Michael Salas had a fullyformed, conscious intent to commit the offense of murder in that structure.
The crime of murder has been previously defined for you in those earlier instructions, actually several times over
. . . .
Even though an unlawful entering a structure is proved, if the evidence does not establish that it was done with the intent, to commit murder, Troy Victorino and/or Jerone Hunter and/or Michael Salas must be found not guilty.
The conjunction "and/or" was also used in instructing on abuse of a dead human body and cruelty to an animal. The trial court instructed the jury as to principals as follows:
I'll define what a Principal is. If Troy Victorino and/or Jerone Hunter and/or Michael Salas helped each other, or another person or persons, commit a crime, Troy. Victorino and/or Jerone Hunter and/or Michael Salas are principals and must be treated as if they had done all things each other, or the other person or persons, did if:
1. Troy Victorino and/or Jerone Hunter and/or Michael Salas had a conscious intent that the criminal acts be done; and,
2. Troy Victorino and/or Jerone Hunter and/or Michael Salas did some act or said some word which was intended to and which did incited [sic], cause encourage, assist, or advise each other, or the other person or persons, to actually commit the crime. To be a principal, Troy Victorino and/or Jerone Hunter and/or Michael Salas does not have to be present when the crime is committed.
(emphasis in original).
Salas argues that under Florida law, this use of "and/or" between the names of co-defendants in the jury instructions constitutes "fundamental error" because it created a situation in which the jury may have convicted Salas solely upon a finding that a codefendant's conduct satisfied the elements of the offense. As noted at the outset of this opinion, because timely objections were interposed to use of the "and/or" conjunction, this is not a fundamental error case.
The use of "and/or" between codefendants' names in jury instructions, where objected to, has been held to constitute reversible error. See, e.g., Womack v. State, 942 So.2d 955 (Fla. 4th DCA 2006) (certifying question of whether use of "and/or" is reversible error where correct principals instruction was given); Dempsey v. State, 939 So.2d 1165 (Fla. 4th DCA 2006) (certifying same question). In Dempsey, the court explained the concern:
Under an "and/or" instruction the jury is informed that if defendant A has committed all the elements of the crime, B is *950 guilty without having committed any elements. Or the jury could find both defendant guilty where it found only A committed some elements of the crime and only B committed other elements.
939 So.2d at 1167.
In other words, the "and/or" conjunction may mislead the jury into believing it can convict the defendant based solely on the acts of his codefendant. Tolbert v. State, 922 So.2d 1013 (Fla. 5th DCA 2006); Santos v. State, 947 So.2d 705 (Fla. 4th DCA 2007) (Taylor, J., concurring specially).
This issue appears to have arisen initially in the context of drug prosecutions where it was held that even in the absence of an objection, fundamental error occurred when the jury was instructed that it could convict the defendant solely on a finding that a codefendant had sold or possessed the illegal drugs. See Davis v. State, 922 So.2d 279 (Fla. 1st DCA 2006); Zeno v. State, 910 So.2d 394 (Fla. 2d DCA 2005); Cabrera v. State, 890 So.2d 506 (Fla. 2d DCA 2005); Davis v. State, 804 So.2d 400 (Fla. 4th DCA 2001); Williams v. State, 774 So.2d 841 (Fla. 4th DCA 2000). In those cases, the instructions informed the jury that it could convict defendant "A" if "A" and/or defendant "B" knowingly purchased, possessed or sold the illegal drugs and if defendant "A" and/or "B" knew of the illegal nature of the substances. An entrapment instruction in Davis also was worded to make the defense of entrapment unavailable for defendant "A" if "A" and/or "B" had the predisposition to commit the crime. Davis, 804 So.2d at 403. By so wording the instruction, the jury was erroneously instructed that if defendant "B" was predisposed to commit the offense, defendant "A" could be deprived of the defense of entrapment
In the absence of a timely objection, use of the "and/or" conjunction in instructing the jury may amount to fundamental error. Appellate courts have, in accordance with the concept of fundamental error set out in Reed v. State, 837 So.2d 366 (Fla. 2002) (failure to correctly define "malice" in aggravated child abuse prosecution is fundamental error in cases where element of malice was disputed; otherwise error is not fundamental), examined the facts and circumstances of the particular case before determining that use of "and/or" rose to the level of fundamental error. See, e.g., Harris v. State, 937 So.2d 211 (Fla. 3d DCA 2006); Brown v. State, 967 So.2d 236 (Fla. 3d DCA 2007); Davis, 804 So.2d at 405.
For instance, in Casimir v. McDonough, 932 So.2d 471 (Fla. 3d DCA 2006), the court was confronted with an ineffective assistance of counsel claim predicated on the jury instructions for criminal conspiracy to commit first degree murder which employed the "and/or" conjunction between the defendant and his codefendant. The court denied relief, explaining:
Casimir claims that the use of the and/or conjunction in this instruction constitutes fundamental error, and therefore, appellate counsel's failure to raise the issue on appeal denied him effective assistance of appellate counsel. We disagree. The instruction, as given, provided that before the jury could find Casimir guilty of conspiracy, the State was required to prove that Casimir intended to kill the victim, that in order to carry out that intent, he conspired with his brother, Frankie Lafontant, an unknown black man, or both, to effectuate the crime. Thus, unlike Davis v. State, 804 So.2d 400 (Fla. 4th DCA 2001), and other cases where it was determined that fundamental error occurred due, to the use of an "and/or" conjunction in a jury instruction, Casimir could not be found guilty of the crime unless he personally intended that murder be committed *951 and conspired with at least one other person to carry out that intent. See also Lloyd v. Crosby, 917 So.2d 988 (Fla. 3d DCA 2005) (finding no fundamental error in the use of the "and/or" conjunction when it is clear that the defendant's conviction could not be based solely upon finding that another defendant's conduct satisfied the elements of the offense).
932 So.2d at 474. See also Tolbert (no fundamental error in use of "and/or" where co-defendant was acquitted by jury on all charges so that jury could not have been misled into believing defendant was guilty based on conduct of his co-defendant).
Garzon v. State, 939 So.2d 278, 279 (Fla. 4th DCA 2006), rev. granted, 956 So.2d 455 (Fla.2007), referenced by the State, found an absence of fundamental error in part because "the principals' instruction placed the substantive crime instruction in the proper context." In Garzon, Coles, Balthazar and Garzon were charged with and tried for criminal conspiracy, armed burglary of a dwelling, armed robbery, kidnapping and extortion arising out of a home invasion. The evidence established that Coles and Balthazar entered the home and committed the charged offenses therein and that Garzon, who had previously installed a wall safe in the home, directed the criminal episode from his cell phone. The conjunction "and/or" was used in the instructions on each offense between the defendants' names, but in addition the court read the standard charge on principals:
If the defendant helped another person or persons commit or attempt to commit a crime, the defendant is a principal and must be treated as if he had done all the things the other person or persons did, if the defendant had a conscious intent that the criminal act be done and the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise the other person or persons to actually commit or attempt to commit the crime. To be a principal, the defendant does not have to be present when the crime is committed or attempted.
Fla. Std. Jury. Instr. (Crim.) 3.5(a).
The Garzon majority explained that the determination of whether fundamental error occurred requires an examination of the other jury instructions, the attorney's arguments and the evidence in the case to determine whether the "`verdict of guilty could not have been obtained without the assistance of the alleged error.'" Id. at 283. The court then explained:
This was not a case where the court failed to correctly instruct on an element of the crime over which there was a dispute. [citations omitted]. All elements of all crimes were correctly charged. What the "and/or" conjunctions placed in issue was whether one defendant could be held criminally liable for the conduct of a codefendant. If the law of principals applies to a defendant's conduct, that defendant can properly be convicted for a codefendant's criminal acts. Garzon could have been found guilty if either Coles or Balthazar committed a substantive crime and Garzon helped either man commit the crime within the meaning of the principals instruction.
In this case, the standard principals instruction placed all the other instructions in the proper context. The instruction explained that a defendant is responsible for the criminal act of another person if "the defendant had a conscious intent that the criminal act be done" and the "defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise the other person . . . to actually commit the crime." Fla. Std. Jury Instr. (Crim.) 3.5(a). If the *952 jury found the principals instruction applied to him, Garzon could lawfully have been found guilty of crimes that either Balthazar or Coles, or both, committed in the house.
With respect to Garzon, everyone in the courtroom knew that the issue boiled down to whether the state had proven that he was the person to whom Balthazar spoke over the cell phone during the home invasion.
The prosecution used the principals instruction as the centerpiece of its argument that Garzon was guilty of the crimes committed by his codefendants. The state did not use the "and/or" conjunctions to argue for a legally incorrect or improper theory of guilt.
Id. at 284.
The Garzon majority certified direct conflict with Cabrera v. State, 890 So.2d 506 (Fla. 2d DCA 2005), Zeno v. State, 910 So.2d 394 (Fla. 2d DCA 2005), and Davis v. State, 922 So.2d 279 (Fla. 1st DCA 2006), each of which rejected the contention that use of the standard "principals" instruction cured the erroneous instructions on the substantive elements of the offenses. We observe that in the present case, the principals instruction suffered from the same infirmity as the other instructions in its use of the "and/or" conjunction.
Salas has demonstrated error in instructing the jury and that this error was preserved by proper objection. The remaining inquiry is whether the State has carried its burden of proving "beyond a reasonable doubt that the error complained of did not contribute to the verdict or, stated alternatively, that there is no reasonable possibility that the error contributed to the conviction." Stires v. State, 824 So.2d 943, 946 (Fla. 5th DCA 2002) (quoting from State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986)). This analysis, stripped to its essence, considers the effect of the error on the jury. Goodwin v. State, 751 So.2d 537, 542 (Fla.1999).
In the instant case, "and/or" was used in each substantive crime instruction though the jury was also instructed in accordance with Standard Jury Instruction (Criminal) 3.12(c) as follows:
Now, a separate crime is charged against eachTroy Victorino and/or Jerone Hunter and/or Michael Salas in each count of the indictment. Troy Victorino and/or Jerone Hunter and/or Michael Salas have been tried together. However, the charges against each, and the evidence applicable to that person, must be considered separately. A finding of guilty or not guilty as to one must not affect your verdict as to any other of the crimes charged.
As the State points out, the verdicts themselves reflect that the jury heeded this admonition. While Hunter, Victorino and Salas were each found guilty of six counts of first degree murder (felony murder and premeditated murder), of conspiracy and of armed burglary, only Victorino was found guilty of abusing the body of Erin Belanger; Hunter and Salas were acquitted. Hunter was convicted of abusing the bodies of Roberto Gonzalez, Jonathan Gleason and Anthony Vega, though Victorino and Salas were acquitted of those charges. Victorino was convicted of cruelty to an animal while Hunter and Salas were acquitted. It is clear that the jury considered each charge and the evidence against each defendant rather than convicting a defendant based solely on the conduct of a codefendant. The verdicts reflect individualized analysis by the jury of the charges against each defendant.[1]
*953 The evidence in this case must next be considered. This is not a case where the defendant was convicted even though he himself was absent from the scene when the crimes were committed or was not an active participant. Compare Dorsett v. McRay, 901 So.2d 225 (Fla. 3d DCA 2005) with Lloyd v. Crosby, 917 So.2d 988 (Fla. 3d DCA 2005). By his own admission, Salas was an active participant who forcibly entered the house, armed with a baseball bat and struck at least one victim, Gonzalez, repeatedly with the bat.
We find, as to the armed burglary conviction, use of the "and/or" conjunction was harmless error. Salas admitted to investigators that he was outside the Telford Lane house on the night in question, armed with a baseball bat. It was undisputed that he entered the house forcibly with Victorino and Hunter sometime after midnight, and that he repeatedly struck Gonzalez with the bat. Additionally, over-powering evidence was presented that Salas intended to commit the offense of murder in the house. Salas was present when the plan was hatched to break into the Telford Lane house and kill the occupants. Salas arrived at the house with a change of clothes and armed himself with a baseball bat. Victorino announced "nobody is going to be survivors" and Salas and his codefendants then forcibly entered the house. Salas was seen hitting one of the victims in the head with a bat. After the crimes were committed, Salas disposed of the bloodied bats. When caught, Salas acknowledged he had taken human life and stated he did not know how he got caught. The individualized verdicts reflect that the jury rejected Salas' trial testimony which itself was contradictory since Salas testified that he did not mean to hurt or kill anyone, yet he acknowledged hitting Gonzalez with a baseball bat. There is simply no way, given Salas' own admissions, the other evidence against him, and the individualized verdicts returned by the jury, that Salas was convicted of this offense based upon the conduct of his codefendants.
We likewise find that as to the six felony murder convictions, the use of the "and/or" conjunction was harmless error. To prove first degree felony murder here, the State was required to prove three elements, first, that the particular victim was dead, second, that the death occurred as a consequence of, and while the defendant was engaged in, the commission of the burglary, and third, that the defendant was the person who actually killed the victim or the victim was killed by a person other than the defendant, but both the defendant and the person who killed the victim were principals in the commission of the burglary. See Carpenter v. State, 785 So.2d 1182 (Fla.2001). In a felony murder context, a defendant is not relieved of culpability for a murder because a codefendant actually "pulled the trigger." Ray v. State, 755 So.2d 604 (Fla.2000). As stated in Ray, "regardless of the identity of the shooter, Ray would still be liable for [the victim's] death as a cofelon when the murder is committed during the course of a felony." 755 So.2d at 609. In Lovette v. State, 636 So.2d 1304, 1306 (Fla.1994), the supreme court explained:
We have stated that "an act in which a defendant does not participate and which is `outside of and foreign to, the common design' of the original felonious collaboration may not be used to implicate the nonparticipant in the act." Parker v. State, 458 So.2d 750, 752 (Fla. 1984) (quoting Bryant v. State, 412 *954 So.2d 347, 349 (Fla.1982)), cert. denied, 470 U.S. 1088, 105 S.Ct. 1855, 85 L.Ed.2d 152 (1985). Felons, however, are generally responsible for the acts of their co-felons. Adams v. State, 341 So.2d 765 (Fla.1976), cert. denied, 434 U.S. 878, 98 S.Ct. 232, 54 L.Ed.2d 158 (1977). As perpetrators of an underlying felony, co-felons are principals in any homicide committed to further or prosecute the initial common criminal design. Adams; Hampton v. State, 336 So.2d 378 (Fla. 1st DCA 1976), cert. denied, 339 So.2d 1169 (Fla.1976). "One who participates with another in a common criminal scheme is guilty of all crimes committed in furtherance of that scheme regardless of whether he or she physically participates in that crime." Jacobs v. State, 396 So.2d 713, 716 (Fla.1981). Although Lovette did not fire the shots that killed the victims, he was a willing participant in the armed robbery of the store. These killings lessened the immediate detection of the robbery and apprehension of the perpetrators and, thus, furthered that robbery. There is a causal connection between the robbery and the homicides, and both Lovette and Wyatt are guilty of felony murder.
Salas was present when the plan was hatched to break into the Telford Lane house and kill the occupants. Thus, even if Salas himself did not beat all the victims to death, it is undisputed that he participated in the armed burglary and the murders were committed in the course and scope of that felony, consistent with the plan which had been announced by Victorino. As in Lovette, these killings lessened the immediate detection and apprehension of those who burglarized the house and thus furthered the burglary. It can be said with certitude that the use of the "and/or" conjunction did not contribute to the verdict against Salas in connection with the armed burglary and felony murder counts.
We are no less certain about the six first degree premeditated murder convictions and the conspiracy conviction. While the instructions as to those counts permitted the jury to find Salas guilty if he, and/or Victorino and/or Hunter had the requisite intent to commit the particular offense and acted on that intent, there exists no reasonable possibility that this error contributed to Salas' convictions. To reiterate, powerful evidence was presented against Salas on the issue of premeditation. This evidence, particularly when combined with the individualized verdicts returned by the jury, makes it abundantly clear, beyond a reasonable doubt, that the jury rejected Salas' trial testimony and that the instructional error did not contribute to the verdicts in this regard.
The same conclusion applies to the conspiracy count. Salas admitted to being present when the plan against the occupants of the Telford Lane house was developed, he agreed to the plan, and did so together with Victorino and Hunter. Again, we can say without hesitation that Salas was convicted for his actions and not those of his co-defendants.
Summarizing, it is the confluence of the instructions in their entirety, the evidence, and the individualized verdicts which render the error in the use of the "and/or" conjunction harmless in this prosecution.

FAILURE TO GIVE DURESS INSTRUCTION
Salas contends that the trial court committed reversible error in failing to instruct the jury on the defense of duress. Salas argues he was entitled to an instruction on his theory of defense regardless of how weak or improbable it may have been, as long as there was some evidence to support it. See Campbell v. State, 577 So.2d 932 (Fla.1991); Mickel v. State, 929 So.2d 1192 (Fla. 4th DCA 2006). Salas requested the court give Standard Jury Instruction 3.6(k) on duress at the charge *955 conference but the court was annoyed that a written instruction was not submitted and then ultimately denied the request, explaining, "I don't think the facts in this case support it."
The State counters by pointing out that under Florida law, duress is not a defense to intentional homicide because "duress will never justify the killing of an innocent third party." Henry v. State, 613 So.2d 429, 432, n. 6 (Fla.1992); Driggers v. State, 917 So.2d 329 (Fla. 5th DCA 2005); Hunt v. State, 753 So.2d 609 (Fla. 5th DCA 2000); Wright v. State, 402 So.2d 493 (Fla. 3d DCA 1981). As explained in Wright, "The common law has steadfastly refused to recognize any compulsion, even the threat of death, as sufficient to excuse the taking of the life of another." 402 So.2d at 498.
Even if duress could be a defense to the underlying felony of armed burglary on the felony murder charges, we believe the trial court did not err in declining to give the instruction.[2]
There are six elements which comprise the defense of duress:
1) the defendant reasonably believed that a danger or emergency existed that he did not intentionally cause;
2) the danger or emergency threatened significant harm to himself or a third person;
3) the threatened harm must have been real, imminent, and impending;
4) the defendant had no reasonable means to avoid the danger or emergency except by committing the crime;
5) the crime must have been committed out of duress to avoid the danger or emergency; and
6) the harm the defendant avoided outweighs the harm caused by committing the crime.
Driggers, 917 So.2d at 330; see also Fla. Std. Jury Instr. (Crim.) 3.6(k).
The defense of duress is not available if the defendant intentionally or recklessly placed himself in a situation in which it was reasonably foreseeable that he would be subject to coercion. Torcia, WHARTON'S CRIMINAL LAW (15th ed.) § 52, Duress. The evidence in this case reflects that Salas, over the course of several days, voluntarily and intentionally placed himself in a situation of escalating criminality and danger. In fact, on the day of the murders, Salas admitted he and Cannon drove to Victorino's residence and picked him up. Further, the only threat of harm referenced below was a vague one, with Victorino telling Salas that if he and Cannon left, they were just like those people in the house. This "threat" did not reflect that harm was in any way imminent and impending. The "threat" was not that Victorino would immediately harm Salas, but rather indicated Salas could leave but may face consequences later. An imminent danger in a duress context is one which cannot be guarded against by calling for the protection of the law. Wright, 402 So.2d at 498, n. 6. The vague threat here did not reach the threshold of a threat of imminent and impending harm which Salas lacked reasonable means to avoid.
*956 Finally, the purported harm which Salas avoided, possible harm to himself, hardly outweighed the harm caused by breaking into the house while armed which directly resulted in the deaths of six people.
The failure to instruct on the defense of duress was not reversible error because the evidence adduced by Salas failed to establish the requisites for such defense. See Worley v. State, 848 So.2d 491 (Fla. 5th DCA 2003).

DENIAL OF CROSS EXAMINATION ON ISSUE OF VICTIMS' ELEVATED BLOOD ALCOHOL LEVELS
Salas claims that the trial court erred in refusing to allow him to present evidence that victims Ayo-Roman and Vega had elevated blood alcohol levels at the time they were murdered. The defense claims this evidence was relevant to its theory of defense, that Salas did not actively participate in the murders and that because these victims had elevated blood alcohol levels, it was possible for the six victims to have been killed in the house by just two people, Victorino and Hunter.
The actual way this issue was raised below is as follows. Salas did not proffer during trial any testimony regarding the blood alcohol levels of the two victims. He claims the State filed a pre-trial motion in limine to prevent the defense from commenting on the victims' alleged use of illegal substances in the presence of the jury, but that motion, which the trial court granted, specifically related only to the victims' purported use or sale of drugs. It did not refer to alcohol usage. Salas called no witness in an effort to present testimony as to the victims' blood alcohol levels so this point on appeal does not involve review of the trial court's refusal, upon proffer, to admit evidence relevant to the defendant's theory of defense. Compare Dean v. State, 916 So.2d 962 (Fla. 4th DCA 2005).
Rather, Salas sought to cross-examine the medical examiner about tests conducted on the two victims that demonstrated elevated blood alcohol levels. Defense counsel stated that blood alcohol tests on victim Vega came out at .08 and .12 while a blood alcohol test on victim Ayo-Roman came out at .07 and .12. The prosecutor objected on relevancy grounds while defense counsel countered that the blood alcohol levels were relevant to explain how six people could have been killed by just two perpetrators (Victorino and Hunter) at one time in the house. The trial court sustained the objection, thereby precluding that line of cross-examination.
There is no indication that the medical examiner testified on direct examination to the blood alcohol levels of the two victims. An appellate court reviews a trial court's ruling concerning the scope of cross-examination for an abuse of discretion. Docekal v. State, 929 So.2d 1139 (Fla. 5th DCA 2006). A defendant has an absolute right to conduct a full and fair cross-examination especially where the witness being cross-examined is the State's key witness. Id. A trial court reversibly errs by prohibiting cross-examination when the facts sought to be elicited are germane to that witness's testimony and plausibly relevant to the theory of defense. Id.
However, cross-examination must relate to credibility of the witness or be germane to the matters brought out on direct examination. Steinhorst v. State, 412 So.2d 332, 337 (Fla.1982). Discussion of the blood alcohol levels of the two victims was not part of the medical examiner's direct testimony and thus was not a proper subject for cross-examination.
Diaz v. State, 747 So.2d 1021 (Fla. 3d DCA 1999), is illustrative. In Diaz, the appellate court found no abuse of discretion *957 in the trial court's refusal to allow defense counsel to cross-examine the medical examiner on the issue of the murder victim's blood alcohol level which the defense claimed was relevant to its claim of self-defense. The medical examiner did not testify regarding the victim's blood alcohol level and the appellate court agreed with the trial court that the subject was "outside the proper scope of cross-examination and was instead directed to the establishment of a defense." 747 So.2d at 1024. The court noted that if the defendant sought "to elicit testimony from an adverse witness which goes beyond the scope encompassed by the testimony of the witness on direct examination, other than matters going to credibility, he must make the witness his own." 747 So.2d at 1023, quoting from Steinhorst, 412 So.2d at 337. The defendant in Diaz, as here, failed to do so. Even though the trial court here did not base its ruling on the principle that the line of questioning exceeded the proper scope of cross-examination, its decision is sustainable on this theory. See Muhammad v. State, 782 So.2d 343 (Fla.2001), which holds that the trial court's ruling on evidentiary matter will be affirmed even if the trial court ruled for the wrong reason, as long as an alternative theory supports the ruling.

ADMISSION OF EVIDENCE OF DEFENDANT'S LACK OF REMORSE.
Salas lastly claims that reversible error occurred when the State, over objection, was permitted to elicit testimony from corrections officer Eunice Williams that during the jail booking, she asked Salas if he had any remorse and he said no. The trial court also denied a request for a mistrial relating to this testimony.
A trial court's ruling as to the admissibility of evidence will not be disturbed absent an abuse of discretion, Blanco v. State, 452 So.2d 520 (Fla.1984), and the State contends that no abuse of discretion has been demonstrated. The State argues that the testimony as to lack of remorse was relevant to show Salas' state of mind about the murders shortly after they occurred and to rebut the claim of Salas at trial that he did not willingly participate in the offenses.
Salas cites to Jones v. State, 569 So.2d 1234 (Fla.1990), as holding that it is error to allow the State to introduce evidence of lack of remorse during the guilt phase of a capital case. Accord Cooper v. State, 856 So.2d 969 (Fla.2003). The Jones court also noted in passing that the prosecutor had been impermissibly allowed during the guilt phase to ask the jury whether it had detected remorse on the part of the defendant. However, in Jones, the murder convictions were affirmed and only the sentences were reversed and the cause remanded for a new sentencing proceeding.
Under Florida law, all relevant evidence is admissible, except as provided by law. § 90.402, Fla. Stat. Relevant evidence is evidence tending to prove or disprove a material fact. § 90.401, Fla. Stat. In order for evidence to be relevant, it must have a logical tendency to prove or disprove a fact which is of consequence to the outcome of the action. See Charles Ehrhardt, Florida Evidence, § 401.1 at 130 (2000). Professor Ehrhardt explains:
The concept of "relevancy" has historically referred to whether the evidence has any logical tendency to prove or disprove a fact. If the evidence is logically probative, it is relevant and admissible unless there is a reason for not allowing the jury to consider it.
Id. at 131-32.
As the State maintains, Salas took the position that while he participated in the crimes charged, he was an unwilling participant who acted only because he had been intimidated by Victorino. His lack of remorse after having been arrested for *958 what had occurred would seem to be at odds with this contention and thus relevant to disprove it. Further, such evidence was not unduly prejudicial. § 90.403, Fla. Stat.
Even if admission of this evidence was error, it was harmless error. The. State adduced overwhelming evidence of Salas' participation in the events of August 5-6, 2004. His claim that he did so under durress was belied by testimony from Eunice Williams that Salas appeared to be joyful and was smirking during the booking process. Investigator Horzepa additionally testified that during questioning on August 8, 2004, Salas was "unconcerned" and "deadpan." The testimony as to a lack of remorse was merely cumulative to other evidence, admitted without objection, that Salas did not display any regret for having participated in the crimes.
Accordingly, the convictions and sentences for armed burglary, first degree murder (felony and premeditated) and conspiracy are affirmed.
AFFIRMED.
PALMER, C.J., and LAWSON, J., concur.
NOTES
[1] In Harris, the Third District rejected a claim of harmless error based on the giving of the instruction that the jury consider each defendant and each charge separately. But in that case, the record did not reflect the return of individualized verdicts. Rather, the jury returned a verdict of guilty on the charge of second degree murder against both Harris and his co-defendant. See also, Dorsett v. McRay, 901 So.2d 225 (Fla. 3d DCA 2005).
[2] Salas argues that duress was a defense to the underlying felony, here burglary, necessary for a felony murder conviction, citing the following passage from Wright:

Wright was charged and defended against first degree murder by premeditated design, which, of course, involves an intent to kill. Where duress is offered as a defense to first degree murder under a felony murder charge, a different question is presented, since duress is a recognized defense to the underlying felony, and the rationale of the rule prohibiting the duress defense in a crime of homicide appears inapplicable.
Wright, 402 So.2d at 498, n. 8.